UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-4892**

(7:10-cr-00117-H-1)

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

MICHAEL DELOS HAMILTON,

        Defendant - Appellant.

O R D E R

      The Court amends its opinion filed November 9, 2012, as follows:

      On page 16, footnote 6, lines 1 and 8-9 -- the words "a military uniform" are changed to read "military medals."

For the Court – By Direction

/s/ Patricia S. Connor
            Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MICHAEL DELOS HAMILTON,

*Defendant-Appellant.*

No. 11-4892

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
Malcolm J. Howard, Senior District Judge.
(7:10-cr-00117-H-1)

Argued: May 15, 2012

Decided: November 9, 2012

Before DAVIS and KEENAN, Circuit Judges, and
James R. SPENCER, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Judge Davis and Judge Spencer joined. Judge Davis wrote a separate concurring opinion.

**COUNSEL**

**ARGUED:** Anne Margaret Hayes, Cary, North Carolina, for Appellant. Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

**OPINION**

BARBARA MILANO KEENAN, Circuit Judge:

Michael Delos Hamilton was convicted by a jury of four charges, which were based on certain intentional misrepresentations he made concerning his service in the United States Marine Corps. These charges included: (1) making false statements in support of a claim for service-related compensation within the jurisdiction of the United States Department of Veterans' Affairs (the VA), in violation of 18 U.S.C. § 1001(a)(2) (the false statements conviction); (2) stealing or converting to his own use more than $30,000 in property belonging to the VA, in violation of 18 U.S.C. § 641 (the theft conviction); (3) wearing a military uniform without authorization, in violation of 18 U.S.C. § 702; and (4) wearing military medals and other insignia (military medals) without authorization, in violation of 18 U.S.C. § 704(a) and (d).

Counts One and Two, the false statements and theft convictions, relate to information Hamilton provided to the VA in order to obtain service-related disability benefits. Counts Three and Four (collectively, the insignia convictions) relate to Hamilton's appearance at a Vietnam Veterans' Recognition Ceremony. At that event, Hamilton wore, without authorization, a military uniform of a rank he had not obtained that was adorned with numerous military medals he had not earned.

After the jury found Hamilton guilty on all charges, the district court imposed concurrent terms of imprisonment for the four offenses, which included two terms of 16 months' imprisonment for the false statements and theft convictions, a term of 6 months' imprisonment for wearing a military uniform without authorization, and a term of 12 months' imprisonment for wearing military medals without authorization. The court also ordered that Hamilton pay restitution to the VA in the amount of $37,635. Hamilton timely filed a notice of appeal.

Hamilton argues on appeal that the false statements and theft convictions should be vacated because the evidence was insufficient to support those convictions. Hamilton also contends that the insignia convictions should be vacated because the statutes underlying those convictions either are facially invalid under the First Amendment, or are invalid as applied to Hamilton in this case.

Upon our review of the parties' arguments, we hold that there is substantial evidence to support both the false statements conviction and the theft conviction. We further hold that the statutes underlying Hamilton's insignia convictions are constitutional, both on their face and as applied to Hamilton. Accordingly, we affirm Hamilton's convictions on all counts.

I.

We begin by describing Hamilton's military career, which provides the factual context for the four charges against him. In July 1961, Hamilton enlisted in the United States Marine Corps. By January 1962, he had been promoted to the rank of private first class. Around this time, while receiving training at Camp Lejeune, North Carolina, Hamilton was involved in an accident and suffered an injury to his hand, resulting in portions of two of his fingers being amputated. He was removed from duty, and ultimately was honorably discharged

with the rank of private first class. Hamilton attempted to re-enlist in the Marine Corps in 1966, but his request was denied.

Hamilton served a total of nine months and twelve days of active duty. During his active duty, Hamilton did not serve in combat or receive any awards, was not commissioned as an officer, and was not deployed outside the United States.

Hamilton received from the VA a "disability rating" of 30 percent for the permanent effects of the injury to his right hand. He began receiving federal benefits based on this disability rating. The VA's decision assigning the 30-percent disability rating noted that Hamilton's residual disability was permanent, and that future examinations were unnecessary.

## II.

## A.

We first address Hamilton's challenges to his false statements and theft convictions. As described below, the factual predicate for each of these convictions relates to Hamilton's claim that he suffered from posttraumatic stress disorder (PTSD).[1]

In May 1997, almost 35 years after receiving his initial disability rating, Hamilton filed an additional claim for disability benefits (the May 1997 claim). In this claim, Hamilton falsely stated that he served in Vietnam from 1963 until 1969, and that he was suffering from symptoms of PTSD as a result of

---

[1]Posttraumatic stress disorder is a "development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience." Stedman's Medical Dictionary 570 (28th ed. 2006). Symptoms of PTSD include "persistently reexperiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, [and] a variety of autonomic and cognitive dysfunctions." *Id.*

his combat experience. At that time, Hamilton provided no further details about his purported disorder.

In response to the May 1997 claim, the VA sent Hamilton a "development letter" seeking, among other items, Hamilton's "personal description of the traumatic events and of subsequent changes in [his] behavior." When Hamilton failed to respond to this letter, the VA denied his PTSD-related disability claim. Hamilton filed another claim for disability benefits in December 2006, which included a statement that he suffered from "severe clinical depression as the result of [his] service in the military." The VA also denied this claim.

Hamilton again filed a disability claim in October 2007, asking the VA to award additional benefits based on PTSD (the October 2007 claim). In contrast to the May 1997 claim in which he stated that his purported PTSD was related to his fictitious service in Vietnam, Hamilton asserted in his October 2007 claim that his PTSD symptoms resulted from the partial amputation of his two fingers. When the VA asked Hamilton to provide "new and material evidence" relating to his PTSD claim, Hamilton responded in a letter stating that it was his "dream" to be a Marine and his "reason for being," and that he was experiencing severe depression based on his inability to serve in combat as a result of his hand injury.[2] Upon receipt of this letter, the VA granted Hamilton a psychological evaluation, which Hamilton did not pursue. Accordingly, the VA denied the October 2007 claim.

After this denial, Hamilton successfully petitioned the VA to reopen the October 2007 claim. Hamilton rescheduled the psychological examination, which occurred in January 2009. Hamilton's VA examination was conducted by Dr. Joseph Chorley, a psychologist affiliated with QTC, a private provider of disability-related examination services for the VA.

---

[2]The evidence is undisputed that Hamilton's professed love of the Marine Corps and his profound disappointment in having his military career ended by his hand injury are sincere.

During his examination by Dr. Chorley, Hamilton chiefly discussed his purported wartime experiences in Southeast Asia, rather than the partial loss of his two fingers, as the reason he was seeking PTSD-related benefits. As documented in Dr. Chorley's report, Hamilton stated that he had experienced wartime atrocities in Vietnam, Laos, and Cambodia, accounts that, unbeknownst to Dr. Chorley, were completely fabricated. Hamilton told Dr. Chorley that between 1962 and 1966, Hamilton had served in a Marine Corps special operations unit. According to Hamilton, during his service in this special operations unit, he was "shot three times, blown up once, and stabbed four times." Hamilton stated that, as a result of these injuries, he had a "plate in his head and a piece of bullet in his back," in addition to having "lost half of his stomach and [having had] his clavicle [ ] cut."

Hamilton also stated to Dr. Chorley that he was promoted to the rank of second lieutenant after arriving in Vietnam, and that eventually he achieved the rank of colonel. Hamilton informed Dr. Chorley that Hamilton's service in the special operations unit was classified, and that there were no written records of this service.

During this examination, Hamilton also claimed that he was experiencing symptoms associated with PTSD after "kill-[ing] hundreds of people in Vietnam," including a young girl. Hamilton further related to Dr. Chorley that he had witnessed the decapitation of his best friend, and that he had "blown up a regimental dump with over 500 people."

The symptoms of PTSD that Hamilton attributed to his service in Vietnam included difficulty eating and sleeping, awakening in the middle of the night screaming, a tendency to act in a withdrawn manner, and having nightmares and "flashbacks." Hamilton also reported that he was "extra cautious when around 'Orientals,'" spoke Vietnamese occasionally when angered, and overreacted to loud sounds and to being touched or grabbed. Hamilton also told Dr. Chorley about

having once "assaulted an 'Oriental' waiter because [Hamilton] saw him with a knife out of the corner of his eye."

As a result of Hamilton's statements during the examination, Dr. Chorley diagnosed Hamilton with depression and PTSD. Dr. Chorley based the PTSD diagnosis on the following symptoms: "[h]istory of exposure to atrocities, life in danger, socially avoidant, avoids people and situations reminiscent of trauma experiences, extreme startle responses, nightmares, history of flashbacks, sleep disturbance, wakes frequently during the night." Dr. Chorley testified at trial that Hamilton's hand injury did not "ha[ve] anything to do with th[e] [PTSD] diagnosis."

After receiving Dr. Chorley's diagnosis, the VA granted Hamilton's October 2007 claim, informing him that "[s]ervice connection for post-traumatic stress disorder is granted with an evaluation of 50 percent effective October 11, 2007." Hamilton's hand injury was mentioned only briefly in the VA's decision assigning the 50-percent disability rating (the ratings decision).

The primary grounds for the ratings decision were the symptoms Hamilton reported experiencing as a result of his purported "special operations" service in Southeast Asia. The ratings decision stated that Hamilton "developed post-traumatic stress disorder as shown in [his] treatment records, despite the unrecorded special operations that [he] served in between 1962 and 1966." The ratings decision referred to the "unrecorded special operations," and recited the symptoms on which Dr. Chorley based his PTSD diagnosis, including nightmares, flashbacks, irritability, and outbursts of anger. Further, the ratings decision discussed the complaints Hamilton made to Dr. Chorley, including awakening in the middle of the night screaming, speaking Vietnamese when angry, being very cautious around "Oriental" people, and overreacting to loud sounds.

The VA combined Hamilton's 50-percent disability rating for PTSD with his previous 30-percent disability rating for his hand injury, and arrived at a combined disability rating of 70-percent, which the VA applied retroactively to the October 2007 date when Hamilton filed his PTSD claim. Based on this revised disability rating, Hamilton received $16,600 in a single retroactive payment and, in accordance with the revised rating, his future monthly benefits were increased by about $900.

In 2010, the VA conducted a further review of Hamilton's file. The VA later sent Hamilton a new ratings decision informing him that "the diagnosis of PTSD provided [by Dr. Chorley] was based, in part, upon claimed stressful events which could not be verified and were not supported by the evidence of record." After the VA requested that Hamilton undergo an additional psychiatric evaluation to determine whether he actually suffered from PTSD, Hamilton cancelled several appointments and did not appear for the additional examination. The VA, now aware that there was no credible evidence showing that Hamilton suffered from PTSD, informed Hamilton that the VA intended to eliminate his PTSD-related disability benefits.

## B.

Hamilton argues that the evidence was insufficient to support his conviction for making a false statement to a government agency, in violation of 18 U.S.C. § 1001(a)(2). We review the district court's denial of Hamilton's motion for judgment of acquittal de novo. *United States v. Osborne*, 514 F.3d 377, 385 (4th Cir. 2008). We will sustain the jury verdict if, viewing the evidence in the light most favorable to the government, there is "substantial evidence" to support the conviction. *Id.* (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)) (additional citations omitted).

A defendant challenging on appeal the sufficiency of the evidence bears a "heavy burden," and must show that a ratio-

nal trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997). A conviction will be reversed for insufficient evidence only in the rare case when "the prosecution's failure is clear." *Beidler*, 110 F.3d at 1067 (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)).

The language of 18 U.S.C. § 1001(a)(2) prohibits "any materially false, fictitious, or fraudulent statement or representation" made in connection with any matter within the jurisdiction of the federal government. To obtain a conviction under this statute, the government must prove that: (1) the defendant made a false statement in a matter involving a governmental agency; (2) the defendant acted knowingly or willfully; and (3) the false statement was material to a matter within the jurisdiction of the agency. *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998). Hamilton does not dispute that he made false statements to Dr. Chorley concerning his purported combat service in Southeast Asia, the atrocities he claims to have witnessed or participated in, and the PTSD-related symptoms he reported based on those fictitious events. Hamilton argues, however, that the government did not meet its proof burden with respect to the second and third elements of the offense. We disagree with Hamilton's argument.

Hamilton submitted the October 2007 claim for PTSD-related benefits after making two unsuccessful attempts to receive additional benefits. He was aware that his previous claims had been rejected based on his failure to "provide evidence which demonstrate[d] the existence of the claimed condition and its possible relationship to service." Having the benefit of this information, Hamilton deliberately communicated false accounts of his military service to Dr. Chorley. Moreover, there is no dispute that Hamilton was aware he had not served in combat and, thus, that he knew the information he was relaying to Dr. Chorley was false. Hamilton also

attempted to shield his deceptive remarks from discovery by informing Dr. Chorley that there were no records of his purported classified service in Southeast Asia. Accordingly, we conclude that the government satisfied its burden of proving that Hamilton acted knowingly or willfully when making his false statements to the VA and its representatives.

Hamilton further argues, however, that the government failed to prove that his false statements were material to the VA's decision awarding him PTSD-related disability benefits. He contends that the statements were not material, because the VA was required to review his service records before granting benefits and his records did not show that he served in Vietnam. Thus, according to Hamilton, it was not objectively reasonable for the VA to rely on his undocumented statements made to Dr. Chorley. We find no merit in this argument.

A statement is "material" for purposes of 18 U.S.C. § 1001 "if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Littleton*, 76 F.3d 614, 618 (4th Cir. 1996). Because the materiality of a statement is viewed under an objective test, it is not germane for purposes of this inquiry whether the false statement actually influenced the agency's decision-making process. *See id.*; *Sarihifard*, 155 F.3d at 307; *see also Kungys v. United States*, 485 U.S. 759, 771 (1988) ("materiality" analysis focuses on the issue whether the misrepresentation "was predictably capable of affecting" agency decision).

In the present case, the government presented evidence showing that Hamilton's false statements were "capable of influencing" the VA's decision to grant his claim for PTSD-related benefits. *See Littleton*, 76 F.3d at 618. Dr. Chorley testified that in reaching his diagnosis, he relied on Hamilton's false report concerning his purported combat duty and his PTSD symptoms. This information provided by Hamilton was

"capable of influencing" the VA's decision, because the diagnosis of a psychological disorder such as PTSD necessarily is influenced by the history provided by a patient, including any symptoms that the patient may be experiencing. Thus, the false account that Hamilton gave to Dr. Chorley was material to the VA's decision because of the natural tendency that such self-reported psychological symptoms, based on the veteran's own account of his or her military service, would influence a decision to award disability benefits on those grounds. *See id.*

The fact that the VA could have discovered Hamilton's fraud earlier through a more thorough search of military records did not render the VA's reliance on Hamilton's statements objectively unreasonable. An agency reviewing a disability claim based on an alleged psychological disorder, as a matter of course, would need to rely at least in part on the claimant's own account of his experiences and his condition. Thus, Dr. Chorley's acceptance of Hamilton's account and resulting diagnosis of PTSD, and the VA's reliance on that diagnosis, were objectively reasonable. Accordingly, we conclude that the evidence supported the jury's finding that Hamilton's false statements were material to the VA's decision, because those statements predictably were capable of affecting that agency decision. *See Kungys*, 485 U.S. at 771.

For these reasons, we conclude that substantial evidence supports the jury's verdict that Hamilton's false statements were made knowingly and willfully, and that the statements were material to the VA's decision. Therefore, we affirm Hamilton's conviction for making false statements to the VA, in violation of 18 U.S.C. § 1001(a)(2).[3]

---

[3]We observe that the Supreme Court discussed 18 U.S.C. § 1001 in its opinion in *United States v. Alvarez* as an example of a statute regulating false speech that "courts generally have found permissible." *Alvarez*, ___ U.S. ___, 132 S. Ct. 2537, 2545-46 (2012) (plurality opinion). Although a plurality of the Court rejected the government's argument that statutes like § 1001 establish that false speech is categorically unprotected by the First Amendment, the plurality made clear that its rejection of the government's argument "does not imply" that § 1001 is "vulnerable." *Alvarez*, 132 S. Ct. at 2546 (plurality opinion); *see also id.* at 2561-62 (Alito, J., dissenting) (discussing § 1001).

C.

We next address Hamilton's argument that the evidence was insufficient to support his conviction for stealing or improperly converting to his own use funds belonging to the VA, in violation of 18 U.S.C. § 641. That statute prohibits, in relevant part, any person from stealing, purloining, or "knowingly convert[ing] to his use" any "voucher, money, or thing of value of the United States or of any department or agency thereof." To obtain a conviction under this statute, the government must establish that: (1) the defendant stole, fraudulently received, or converted to his own use (2) money of the United States (3) with the intent to permanently or temporarily deprive the government of that money. *See United States v. McRee*, 7 F.3d 976, 980 (11th Cir. 1993); *see also United States v. Hall*, 549 F.3d 1033, 1038 (6th Cir. 2008) (same). We turn to consider the issue whether, viewing the evidence in the light most favorable to the government, there was "substantial evidence" to support Hamilton's conviction under this statute. *See Burgos*, 94 F.3d at 862.

Hamilton initially challenges his theft conviction on the ground that the evidence was insufficient to show that he intended to receive the VA disability benefits through deceit. We find no merit in this argument.

Hamilton told numerous falsehoods, which we already have related, that amply support the conclusion that he intended to obtain the PTSD diagnosis by whatever means necessary, including wholesale deceit. Before giving his false accounts to Dr. Chorley, Hamilton had been informed by the VA that his October 2007 claim for PTSD-related benefits required "new and material" evidence. Thus, based on these facts, a jury could find that Hamilton acted in a deceitful manner with the intent to supply the VA all information, including false information, necessary to receive the additional benefits he sought.

Hamilton argues, nevertheless, that the evidence failed to establish that the VA awarded the PTSD-related disability benefits based on his false statements about his combat experience, rather than on the training accident in 1962 that resulted in his partial loss of two fingers. However, reviewing the evidence in the light most favorable to the government, as required, *see Osborne*, 514 F.3d at 385, we must reject Hamilton's argument.

Although the VA's decision awarding benefits briefly mentions Hamilton's hand injury, most of the report discusses the fictitious events and symptoms that Hamilton relayed to Dr. Chorley during his evaluation. The VA's ratings decision concludes that Hamilton developed PTSD "as shown in [his] treatment records, despite the unrecorded special operations that [he] served in between 1962 and 1966." The symptoms of PTSD discussed in the ratings decision, including nightmares, flashbacks, and anger toward "Orientals," bear no relationship to Hamilton's hand injury.

Additionally, Kenneth Mauer, a VA review officer, testified that the award of benefits to Hamilton "hinged" on Dr. Chorley's PTSD diagnosis, and that nothing in the medical file indicated that Hamilton discussed with Dr. Chorley symptoms of PTSD relating to his hand injury. Mauer further testified that the reason Hamilton's claim was approved was because Dr. Chorley "accepted his claims about Vietnam atrocities and injuries." Based on this evidence, the jury was entitled to conclude that the VA's decision granting Hamilton's disability claim was based on the false statements concerning his combat experience, rather than on any trauma from the hand injury during training exercises in 1962.

As a final matter, Hamilton argues that the theft conviction should be vacated on the ground that the award of benefits "remained under consideration" at the time of trial, because the VA had characterized the award as "premature." According to Hamilton, this characterization established that Hamil-

ton may in fact be "entitled to the very benefits he was convicted of stealing." We disagree with Hamilton's argument.

For more than 40 years after Hamilton's hand injury, his disability rating remained at 30 percent. The increased disability rating resulted from Dr. Chorley's examination and diagnosis of PTSD which, as discussed, centered on Hamilton's false statements concerning his claimed combat experience. Moreover, there is no evidence in the record showing that Hamilton suffers from PTSD as a result of his hand injury. Therefore, Hamilton's argument that he "may" be entitled to benefits based on PTSD resulting from his hand injury is highly speculative and wholly unsupported by the present record. Accordingly, we affirm Hamilton's conviction for stealing or unlawfully converting government funds in violation of 18 U.S.C. § 641.

III.

A.

The facts underlying Hamilton's insignia convictions relate to his appearance at a Vietnam Veterans' Recognition Ceremony held in April 2010 (the recognition ceremony). This event was organized by a local chapter of the Vietnam Veterans' Association of America.

The evidence showed that Hamilton contacted Paul Crowell, the coordinator for the recognition ceremony, and offered to help in performing any tasks associated with the ceremony. During this conversation, Hamilton discussed his fictitious service in Vietnam and the military awards he purportedly had received.

About one week before the recognition ceremony, the scheduled guest speaker cancelled his intended appearance. Crowell later invited Hamilton to give the speech, based on

Crowell's understanding from his conversation with Hamilton that he had received many military awards during his service in Vietnam. Hamilton accepted the invitation, and did not request or receive any compensation for his appearance. Crowell asked Hamilton to wear a uniform to the ceremony, informing him that the "uniform of the day" was "service dress blue."

Hamilton wore to the recognition ceremony the uniform of a United States Marine colonel, including an officer's sword and belt, and white gloves. The uniform Hamilton wore was adorned with many medals, ribbons, stars, and rank insignia. Hamilton had not been awarded any of the military medals he displayed, which included two Navy Crosses, four Silver Stars, one Bronze Star, and seven Purple Hearts, among many other awards displayed on the uniform. In short, as attested by Retired Sergeant Major Joseph Houle, a Marine veteran, Hamilton wore the uniform of a "hero" during his speech.[4]

Hamilton's appearance at the recognition ceremony was not the first time that he falsely had worn a military uniform without authorization. On three separate occasions on military bases, in 1996, 2000, and 2007, Hamilton wore Marine Corps uniforms representing ranks that he had not achieved.[5] During

[4]Hamilton's speech was given to a crowd containing a number of prominent community and military leaders. The speech focused on Hamilton's purported combat experiences, the number of men he supposedly had lost in combat, his alleged "battlefield" promotion from captain to colonel, and the lack of recognition that Vietnam veterans received when they returned to the United States. Although substantial portions of Hamilton's speech were patently false, the content of that speech has no impact on Hamilton's insignia convictions.

[5]In 1996, Hamilton was observed wearing the uniform of a general officer on a military installation during an attempt to purchase a general's hat at the base clothing store. In 2000, Hamilton was seen wearing the uniform of a colonel to a Marine Corps graduation ceremony. In 2007, Hamilton was observed wearing a Marine Corps camouflage uniform, bearing the rank of a lieutenant general, in the "food court" area of a military exchange. After each of these incidents, military personnel escorted Hamilton from, or asked Hamilton to leave, the respective military facilities. The jury heard evidence relating to these incidents pursuant to Rule 404(b) of the Federal Rules of Evidence.

the 1996 incident, Hamilton was warned that it was illegal to impersonate a military officer. When later confronted by an investigator regarding the various incidents, Hamilton agreed that he should not be impersonating an officer, and stated that he "would not be doing [that] again." Hamilton was not formally charged with wearing a military uniform without authorization as a result of any of those three incidents.

B.

Hamilton argues that his convictions for wearing a military uniform without authorization, in violation of 18 U.S.C. § 702 (Section 702), and for wearing military medals without authorization, in violation of 18 U.S.C. § 704(a) (Section 704(a)),[6] violate his First Amendment rights. We review de novo the district court's holding that Section 702 and Section 704(a) (collectively, the insignia statutes) do not violate the First Amendment. *United States v. Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011); *United States v. Malloy*, 568 F.3d 166, 171 (4th Cir. 2009).

Hamilton's primary argument is that the insignia statutes are facially unconstitutional. As an initial matter, we observe that the Supreme Court repeatedly has stated that facial invalidation of legislation is disfavored. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998); *United States v. Chappell*, No. 10-4746, ___ F.3d ___, 2012 WL 3292420, at *2 (Aug. 14, 2012) (collecting

---

[6]Hamilton's conviction for wearing military medals without authorization in violation of 18 U.S.C. § 704(a) also involved a violation of § 704(d), which mandates an enhanced penalty for offenses involving certain specific medals, including a Navy Cross, a Silver Star, and a Purple Heart. A violation of § 704(d) increases the statutory maximum penalty from six months' imprisonment to one year's imprisonment. Hamilton does not separately challenge his conviction with respect to § 704(d), and, accordingly, our analysis with respect to his conviction for wearing military medals without authorization focuses on § 704(a).

cases). Such disfavor is warranted because "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451; *see also Chappell*, 2012 WL 3292420 at *2.

In advancing his facial challenge, Hamilton argues that the government's interests underlying these statutes are related to the suppression of expression, and that, therefore, "the most exacting scrutiny" should apply in determining whether the statutes are constitutional. *See Texas v. Johnson*, 491 U.S. 397, 412 (1989). Hamilton asserts that the insignia statutes cannot survive exacting scrutiny, because they are not narrowly tailored to serve the government's interest in preserving the integrity of the military and in preventing the deceptive wearing of military uniforms and medals.

In response, the government contends that the insignia statutes are subject to the "relatively lenient" standard articulated in *United States v. O'Brien*, 391 U.S. 367, 377 (1968).[7] Under this standard, the insignia statutes need not be narrowly tailored to the government's interests or be the least restrictive means of achieving those interests. Instead, the statutes need only satisfy the less stringent standard of promoting an important or substantial government interest in a manner "'that would be achieved less effectively absent the regulation.'" *Rumsfeld v. Forum for Academic & Inst'l Rights, Inc.*, 547 U.S. 47, 67 (2006) (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

Before we address the level of scrutiny applicable to our analysis of the insignia statutes, we first must consider the range of conduct covered by the statutes. We undertake this preliminary analysis because "it is impossible to determine

---

[7]The Supreme Court characterized the *O'Brien* standard as being "relatively lenient" in *Johnson*. *See* 491 U.S. at 407.

whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008).

Section 702 addresses the unauthorized wearing of military uniforms. This statute provides that "[w]hoever, . . . without authority, wears the uniform or a distinctive part thereof or anything similar to a distinctive part of the uniform of any of the armed forces of the United States" is subject to a monetary fine or to a term of imprisonment not exceeding six months. 18 U.S.C. § 702.

Section 704(a) addresses the display of military medals, encompassing various forms of conduct including the wearing, purchasing, solicitation, importation, exportation, sale, trading, or advertising of such military medals. In relevant part, Section 704(a) provides that "[w]hoever knowingly wears . . . any decoration or medal authorized by Congress for the armed forces of the United States, or any of the service medals or badges awarded to the members of such forces . . . or any colorable imitation thereof, except when authorized under regulations made pursuant to law," is subject to a monetary fine or to a term of imprisonment not exceeding six months.[8] 18 U.S.C. § 704(a).

The government acknowledges that a broad reading of the insignia statutes could "raise serious constitutional concerns," because such a reading would prohibit anyone from wearing a military medal who did not validly receive it, or anyone from wearing a military uniform without express authority, under *any* circumstances. Under that view, for example, it would be unlawful for grandchildren to wear their grandparents' medals during a Veterans Day parade, for persons to wear a military uniform to a Halloween party, or for actors,

---

[8]As discussed previously, Hamilton's conviction also involved a violation of 18 U.S.C. § 704(d), which increased his statutory maximum punishment from six months' imprisonment to one year's imprisonment.

including children participating in a school play, to wear a military uniform or imitation military medals. *See United States v. Perelman*, 658 F.3d 1134, 1136-37 (9th Cir. 2011) (listing these and other examples of conduct potentially prohibited by a literal interpretation of Section 704(a)), *amended and superseded on denial of reh'g*, ___ F.3d ___, 2012 WL 3667348 (9th Cir. Aug. 28, 2012).

As a "cardinal principle" of statutory interpretation, we may avoid such serious constitutional concerns if we are able to "ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (citation and internal quotation marks omitted). Thus, when "an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also Legend Night Club v. Miller*, 637 F.3d 291, 300 (4th Cir. 2011) (holding that this Court will not strike down a statute as facially overbroad if the statute's constitutionality may be preserved through a "limiting construction" or "partial invalidation").

We observe that the Ninth Circuit applied such a limiting construction to Section 704(a) in *United States v. Perelman*, holding that the statute created a criminal offense prohibiting the unauthorized wearing of military medals only when the wearer "has an intent to deceive." 658 F.3d at 1137-38; 2012 WL 3667348 at *4. In our view, the imposition of a limiting construction requiring an "intent to deceive" is appropriate with respect to both Sections 702 and 704(a).[9] In fact, Section

---

[9]We find no merit in Hamilton's argument that we should refrain from employing a limiting construction requiring an intent to deceive in considering his constitutional challenge, because the district court did not include that construction in its charge to the jury. Hamilton has not challenged in

704(a) already contains certain limitations restricting its application. A violation of that statute occurs only when a person "knowingly wears" a military medal, "or any colorable imitation thereof." Thus, in drafting this statute, Congress manifested its intent that application of the statute be restricted to avoid absurd results. *See Perelman*, 658 F.3d at 1137; 2012 WL 3667348 at *4 ("By prohibiting the wearing of a colorable imitation and by including a scienter requirement, Congress made clear that deception was its targeted harm.").

The application of a limiting construction to the insignia statutes requiring an "intent to deceive" is not "plainly contrary to the intent of Congress." *See Edward J. DeBartolo Corp.*, 485 U.S. at 575. Indeed, the rejection of such a limiting construction could lead to absurd results, as discussed above and in *Perelman*. Accordingly, we hold that persons violate the insignia statutes if they wear a military uniform without authorization, or wear military medals or imitations of such medals, respectively, only when they do so with the intent to deceive.

We turn now to consider the level of scrutiny that should be applied in our determination whether the insignia statutes violate the First Amendment. Initially, we observe that in its

---

this appeal the adequacy of the jury instructions or the sufficiency of the government's evidence with respect to the insignia convictions, but instead attacks those convictions on the sole ground that the insignia statutes violate the First Amendment. This constitutional challenge is not affected by the content of the jury instructions or by the quantum of proof presented by the government at trial regarding the intent to deceive. Moreover, we observe that the government presented overwhelming and uncontradicted evidence at trial establishing that Hamilton's conduct was intentionally deceptive. *See United States v. Ramos-Cruz*, 667 F.3d 487, 495-99 (4th Cir. 2012) (holding that although Supreme Court case issued after defendant's trial rendered his jury instructions incorrect, any error in instructions was harmless because there was "overwhelming proof" of guilt with respect to element of the offense that was omitted from the jury instructions).

recent decision in *United States v. Alvarez,* \_\_\_ U.S. \_\_\_, 132 S. Ct. 2337 (2012), the Supreme Court considered a First Amendment challenge to 18 U.S.C. § 704(b), which established as a criminal offense any false spoken or written claims concerning the receipt of military decorations or medals. Because Section 704(b) proscribed pure speech, a plurality of the Supreme Court applied "exacting scrutiny" to its consideration of the constitutionality of that statute.[10] *Alvarez,* 132 S. Ct. at 2348-50 (plurality opinion); *id.* at 2355-56 (Breyer, J., concurring in judgment) (concluding Section 704(b) violated the First Amendment because the government could achieve its objective in less burdensome ways).

In contrast to Section 704(b), the insignia statutes do not regulate pure speech but instead proscribe certain forms of expressive conduct. In framing our analysis, we rely on the Supreme Court's decisions in *Johnson* and *O'Brien*, which set forth the level of scrutiny applicable in constitutional challenges to statutes regulating conduct rather than speech.

In its decision in *O'Brien*, the Supreme Court explicitly rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 391 U.S. at 376. Further, in *Johnson*, the Court explained that although expressive conduct often includes both communicative and non-communicative elements, this mode of expression may be regulated by the government with a "freer hand" than the written or spoken word. 491 U.S. at 406. Thus, as a general principle, expressive conduct is not entitled to the same degree of protection under the First Amendment as is pure speech. *See Johnson,* 491 U.S. at 407; *O'Brien,* 391 U.S. at 376-77; *see also Dallas v. Stanglin,* 490 U.S. 19, 25 (1989); *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293 (1984);

---

[10]We discuss the Supreme Court's decision in *Alvarez* in greater detail in part III(D) of this opinion.

*Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 637 (4th Cir. 1999).

In *O'Brien*, the Supreme Court analyzed a defendant's First Amendment challenge to his conviction for burning his selective service registration certificate (draft card).[11] The defendant testified during his trial that he burned the draft card in a public place to persuade other people to adopt his antiwar beliefs. *O'Brien*, 391 U.S. at 370. The Court of Appeals for the First Circuit held that the statute at issue violated the First Amendment, but the Supreme Court reversed and reinstated O'Brien's conviction. *Id.* at 371-72.

In concluding that the statute under which the defendant was convicted was constitutional, the Supreme Court announced that a government regulation infringing on expressive conduct is permissible: "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377. The Court later stated that the fourth element of the *O'Brien* test is not a "least restrictive means" test. Explaining this distinction, the Court stated that "an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Rumsfeld*, 547 U.S. at 67.

---

[11]At the time the defendant burned his draft card, federal regulations required that registrants of the selective service keep their draft cards in their personal possession at all times. *O'Brien*, 391 U.S. at 371, 375 n.20. A federal statute then in effect, 50 U.S.C. App. § 462(b), created a criminal offense for the act of "knowingly destroy[ing] [or] knowingly mutilat[ing]" a draft card. *Id.* at 375.

In *Johnson*, however, the Supreme Court declined to apply the *O'Brien* test in considering the constitutionality of a Texas statute that prohibited the desecration of certain "venerated objects." 491 U.S. at 400, 407-10. The defendant in *Johnson* was prosecuted under Texas law for burning a flag, which he did in a public place as a means of political protest. *Id.* at 399.

In assessing the defendant's First Amendment challenge in *Johnson*, the Court held that the *O'Brien* standard was inapplicable because that "relatively lenient standard" applied in cases in which the governmental interest is "unrelated to the suppression of free expression." 491 U.S. at 407 (citation omitted). The Court further explained that "[i]n order to decide whether *O'Brien*'s test applies here, therefore, we must decide whether Texas has asserted an interest in support of Johnson's conviction that is unrelated to the suppression of expression." *Id.*

The Court held that Texas' only proffered interest implicated by the facts of the case was its interest in preserving the flag as a symbol of national unity, an interest that the Court determined was related to the suppression of free expression. *Id.* at 407-10. Concluding that "[w]e are thus outside of *O'Brien*'s test altogether," the Court held that the Texas statute was subject to "the most exacting scrutiny."[12] *Id.* at 410, 412.

As the Supreme Court's decisions in *O'Brien* and *Johnson* illustrate, the key factor that determines whether we apply the "relatively lenient" test employed in *O'Brien*, or the "most exacting scrutiny" standard set forth in *Johnson*, is whether the statute being reviewed is related to the suppression of free

---

[12]The Supreme Court has equated the phrase "most exacting scrutiny" with its frequently-used term "strict scrutiny." *See, e.g., Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996); *Ward v. Rock Against Racism*, 491 U.S. 781, 800 n.6 (1989); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 290-91 (1978).

expression. This issue presents a close question, at least with respect to the "wearing" component of the insignia statutes under which Hamilton was convicted. On their face, the insignia statutes are not related to the suppression of free expression. Neither of these statutes "prevent[s] the expression of any particular message or viewpoint." *See Perelman*, 658 F.3d at 1140; 2012 WL 3667348 at *5 (applying *O'Brien* test in affirming defendant's conviction under Section 704(a)). The insignia statutes do not restrict expression or debate concerning military policy, the meaning of military uniforms or military medals, the values that they represent, or any other topics of public concern relating to the military.[13]

Our application of the "intent to deceive" limiting construction, however, complicates the matter. For instance, a defendant charged with violating the insignia statutes may have "intended to deceive" by communicating the false message that he actually earned the adorned uniform or military medals.[14] The insignia statutes' prohibition of this conduct arguably falls within the realm of the *Johnson* "most exacting scrutiny" test because the prosecution of that defendant would necessarily be related to the suppression of free expression. Thus, in applying the insignia statutes only to intentionally deceptive conduct based on the limiting construction discussed in this opinion, these statutes could reach conduct that solely involves free expression, within the holding of *Johnson*.

In the present case, however, we need not resolve the issue whether the more lenient *O'Brien* standard or the more demanding *Johnson* standard applies in evaluating Hamilton's

---

[13]Moreover, we observe that, on their face, the insignia statutes apply equally to the most vocal supporters of our armed forces, such as Hamilton himself, as well as to those opposed to certain actions undertaken by the military branches.

[14]As discussed by the plurality and concurrence in *Alvarez*, the fact that speech may be false does not mean that such speech is outside the realm of First Amendment protection. 132 S. Ct. at 2545-47 (plurality opinion); *id.* at 2553-55 (Breyer, J., concurring in judgment).

constitutional challenge because we conclude that the insignia statutes withstand a facial challenge under even "the most exacting scrutiny." Accordingly, we will assume, without deciding, that the more demanding standard discussed in *Johnson* applies in this case.[15]

The "most exacting scrutiny" standard requires the government to establish that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Boos v. Barry*, 485 U.S. 312, 321-22 (1988) (cited in *Johnson*, 491 U.S. at 412).[16]

The first prong of this analysis requires us to determine whether the government's interests underlying the insignia statutes are "compelling." The statutes, as construed in conformance with the limiting construction requiring an intent to deceive, prevent the intentionally deceptive wearing of military uniforms and military medals. Military uniforms are a recognized symbol of our armed forces, and the uniforms themselves convey information about the rank and accomplishments of the wearer, as well as about the particular branch of the armed forces being represented. Military medals

---

[15]With respect to Hamilton's constitutional challenge to 18 U.S.C. § 704(a), our analysis applies only to the "wearing" component of that statute, which entails a much greater degree of expressive activity, and thus First Amendment protection, than the other activities prohibited by § 704(a), such as selling, purchasing, mailing, or manufacturing military medals. We do not suggest that the *Johnson* "most exacting scrutiny" standard is applicable to these other types of conduct prohibited by § 704(a), nor do we suggest that an "intent to deceive" limiting construction would be required for these other activities.

[16]The Court's decision in *Johnson* itself does not set forth the *Boos* definition of "the most exacting scrutiny," but rather cites to that portion of the *Boos* opinion in which the definition quoted here is contained. Additionally, the decision in *United States v. Eichman*, 491 U.S. 310, 318 (1990), in which the Supreme Court held the federal National Flag Act unconstitutional for the reasons stated in *Johnson*, also cited to, but did not elaborate on, the explanation of "the most exacting scrutiny" standard in *Boos*.

are institutional symbols of honor and prestige, which enhance military morale and recognize the accomplishment of difficult missions by members of the armed services. Additionally, military uniforms and military medals publicly promote the integrity of the military system by honoring members of our military for their service and their sacrifices.

The intentionally deceptive wearing of military uniforms and military medals threatens to weaken this tradition because such deceptive practices, if left unchecked, could diminish the symbolic value of these items. Deceptive actions of this nature also frustrate the government's efforts to ensure that members of the military and the general public perceive military honors as being awarded only to a limited number of deserving recipients. Accordingly, we hold that the government's interest in preserving the integrity of the system honoring military members for their achievements and sacrifices is compelling. *See United States v. Alvarez*, 617 F.3d 1198, 1216 (9th Cir. 2010), *aff'd*, 132 S. Ct. 2537; *Perelman*, 658 F.3d at 1140; *id.*, 2012 WL 3667348 at *5; *see also Alvarez*, 132 S. Ct. at 2549 (plurality opinion) (observing that the government's interest in "protecting the integrity of the Medal of Honor is beyond question" and characterizing that interest as "compelling"); *id.* at 2555 (Breyer, J., concurring in judgment) (characterizing the government's interest in preserving the integrity of the military honors system as "substantial").

We also note that the importance of the uniform, which conveys a particular military rank, is not limited to the general public's perception of that rank. Rather, military uniforms are directly and inextricably linked to the effective operation of the military chain of command, because the unauthorized wearing of military uniforms may convey misleading information to other members of the military about the rank, if any, of the wearer. Thus, because the display of a military rank could have actual consequences, particularly when a uniform is worn on or near a military base,[17] we conclude that the

---

[17]For instance, on one of the occasions described earlier in which Hamilton was found unlawfully wearing a military uniform on a military base,

government's interest in maintaining the orderly administration of the chain of military command is compelling.

Having concluded that the government's interests underlying the insignia statutes are "compelling," we must examine whether the statutes are "narrowly drawn to achieve" those interests. *Boos*, 485 U.S. at 321-22. In analyzing the "fit" between the insignia statutes' prohibitions and the governmental interests involved, we observe that the primary concerns targeted by the insignia statutes include: 1) the potential debasement of military awards and uniforms; 2) the avoidance of an implication that military honors are awarded on a frequent and routine basis; and 3) avoiding obstructions to the orderly administration of the chain of military command.

We conclude that the insignia statutes are drawn sufficiently narrowly to satisfy the "most exacting scrutiny" standard. By preventing the unauthorized wearing of military uniforms and honors, the insignia statutes seek to ensure that the individuals displaying these honors to the general public are those who actually have received such honors. Moreover, we observe that the insignia statutes, which address the *wearing* of military uniforms and medals, unquestionably further the government's interest in preventing the appearance that military honors are given more often than actually is true, as well as furthering the government's interest in maintaining the orderly administration of military command.

Additionally, by preventing those who have not earned such honors from displaying them, the "unauthorized wearing" component of the insignia statutes helps limit the demand

---

an investigator began running toward Hamilton but hesitated when he got close enough to observe Hamilton's apparently superior rank. Although that hesitation did not result in any harm in that instance, it is not difficult to imagine a scenario in which even a momentary delay could result in serious consequences.

in a "secondary market" for these symbols of high military achievement, providing additional support to the other prohibitions contained in Section 704(a). *See* 18 U.S.C. § 704(a) (also prohibiting, among other forms of conduct, the purchase, sale, or manufacturing of military honors). Because the insignia statutes prohibit the wearing of symbols of military honor that have not been earned, individuals will be less likely to purchase such items to wear. Thus, absent the protections afforded by the insignia statutes, the number of individuals wearing military medals and uniforms without authorization, and their ability to purchase those symbols of honor, likely would pose a greater problem.

Hamilton argues, nevertheless, that Congress could have furthered its interests by less restrictive means, such as by publicizing the names of the legitimate recipients of military honors or the names of those who have falsely claimed to receive such honors. These alternatives were identified by the Supreme Court and the Ninth Circuit in their respective decisions in *Alvarez.* 132 S. Ct. at 2551 (plurality opinion); *id.* at 2556 (Breyer, J., concurring in judgment); 617 F.3d at 1210. In our view, these alternatives are less applicable to the interests underlying the conduct-based prohibitions of the insignia statutes than the speech-based prohibition of 18 U.S.C. § 704(b).

As an initial matter, the actual appearance of the military uniform and military medals more strongly conveys the impression that the wearer has earned the honors displayed than when a person merely states that he has earned such honors. In our view, the wearing of an unearned medal or uniform of an unearned rank is more convincing evidence of such actual attainment than words alone, by constituting ostensible, visual "confirmation" that the wearer earned such honors. As expressed by a familiar adage, "seeing is believing." Thus, we agree with the Ninth Circuit's statement in its amended opinion in *Perelman* that "[t]he use of a physical object goes beyond mere speech and suggests that the wearer has proof of

the lie, or government endorsement of it." 2012 WL 3667348 at *4 (explaining why Supreme Court's decision in Alvarez does not require conclusion that 18 U.S.C. § 704(a) is unconstitutional). Accordingly, we conclude that the government's interests are more greatly affected in this case than in the statute at issue in *Alvarez*.

The plurality in *Alvarez* concluded that 18 U.S.C. § 704(b) was not sufficiently tailored to the government's interests because "[t]he Government has not shown, and cannot show, why counterspeech would not suffice to achieve its interest. . . . [T]he dynamics of free speech, of counterspeech, of refutation, can overcome the lie. . . . The remedy for speech that is false is speech that is true." 132 S. Ct. at 2549-50.

Notably, however, the remedy of "counterspeech" discussed in *Alvarez* would be much less effective in the present context, which involves the false display of military honors, rather than false words concerning military honors. Although speech may effectively counter other matters that a person hears, speech may not effectively counter that which a person sees.

We also observe that the plurality and concurrence in *Alvarez* concluded that the government in that case could have achieved its interests underlying 18 U.S.C. § 704(b) in a less restrictive way, by creating and maintaining a database listing all individuals who have been awarded the Congressional Medal of Honor. However, Hamilton does not suggest, nor do we have reason to conclude, that the government could create and maintain such a database for all honors ever awarded to military personnel,[18] much less one listing the rank of every individual who has served in our armed forces.

---

[18]Hamilton wore about 20 different types of military medals or ribbons on his uniform during his speech. By contrast, only one type of award, the Congressional Medal of Honor, was at issue in *Alvarez*.

Even if such a database were technically feasible, concerns about privacy and identity fraud could render such a database unwise.[19] Additionally, we observe that the other government interests underlying the insignia statutes discussed in this opinion, namely, the effective operation of the military chain of command and the diminution of a "secondary market" for military honors, would not be protected by the less-restrictive alternative suggested by Hamilton and discussed by the Supreme Court in *Alvarez*. Thus, such an alternative would be a less workable and less effective protection for the interests underlying the conduct at issue in this case.

Accordingly, we conclude that the insignia statutes promote the government's "compelling" interests in a manner that is "narrowly drawn" to achieving those interests. *See Boos*, 485 U.S. at 321-22. Therefore, even under "the most exacting scrutiny" standard discussed in *Johnson* that we consider here, we hold that the insignia statutes on their face, as construed in accordance with an "intent to deceive" limiting construction, do not violate the First Amendment.[20]

## C.

We next address Hamilton's brief argument that the insignia statutes are unconstitutional as applied to him. In that cursory argument, Hamilton asserts that his convictions violate the First Amendment because the uniform and medals he displayed at the recognition ceremony gave his speech a greater impact than had he delivered the speech in civilian clothing.

---

[19]Moreover, a viewer may be less likely to seek out confirmation of the truth of the military honor displayed, than the viewer would after hearing a statement asserting the attainment of such honor, rendering the availability of such a database less effective in this context than posited in *Alvarez*.

[20]We also note that our holding is supported by the Supreme Court's decision in *Schact v. United States*, in which the Court stated in dicta that "[o]ur previous cases would seem to make it clear that 18 U.S.C. § 702, making it an offense to wear our military uniforms without authority is, standing alone, a valid statute on its face." 398 U.S. 58, 61 (1970).

However, our application of the "most exacting scrutiny" standard, as set forth in *Johnson*, assumed that all prosecutions for violating the insignia statutes were related to the suppression of expressive conduct. Hamilton does not identify any unique facet of his conviction that would distinguish it from any other conviction that could be obtained under the insignia statutes. Having concluded that the insignia statutes withstand a facial challenge, and observing that Hamilton's conduct was squarely prohibited by the statutes, we must therefore reject Hamilton's as-applied constitutional challenge to his convictions for violating these statutes,[21] and we affirm his convictions with respect to those charges.

## D.

Our conclusions affirming the constitutionality of the insignia statutes are not altered by the Supreme Court's decision in *United States v. Alvarez*.[22] As stated above, the Court held in *Alvarez* that 18 U.S.C. § 704(b), which imposed criminal

---

[21]We further observe that Hamilton has not set forth in his brief precisely what his intended "particularized message" was, nor has he developed an argument that "the likelihood was great that [his] message would be understood by those who viewed it." *See Johnson*, 491 U.S. at 404 (citing *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)).

[22]We briefly detail the temporal intersection between this case and *Alvarez*. Hamilton filed his notice of appeal from his conviction on September 7, 2011, about a month before the Supreme Court granted Alvarez's petition for a writ of certiorari from the Ninth Circuit's judgment. The Supreme Court heard oral argument in *Alvarez* on February 22, 2012, the same day on which Hamilton filed his opening brief in this Court. We heard oral argument in this case on May 15, 2012. The Supreme Court issued its decision in *Alvarez* on June 28, 2012, and we considered the supplemental filings made by Hamilton and the government after *Alvarez* was issued concerning the parties' respective positions about the effect of *Alvarez* on this case. Accordingly, at all critical stages of this appeal, this Court and the parties were well aware of the Supreme Court's pending decision in *Alvarez* and the possibility that *Alvarez* could affect the outcome of this case, depending on the breadth of the Supreme Court's holding.

penalties for false oral or written claims concerning the receipt of military decorations or medals,[23] violated the First Amendment. *Alvarez*, 132 S. Ct. at 2551 (plurality opinion); *id.* at 2556 (Breyer, J., concurring in judgment).

The plurality opinion[24] accepted the proposition that certain harms may result from false statements concerning the receipt of military medals, including that "when a pretender claims [a military medal] to be his own, the lie might harm the Government by demeaning the high purpose of the award, diminishing the honor it confirms, and creating the appearance that the [military medal] is awarded more often than is true." *Id.* at 2549 (plurality opinion). Nevertheless, the plurality opinion concluded that such interests did "not satisfy the Government's *heavy burden* when it seeks to regulate protected *speech*." *Id.* (emphasis added). The plurality opinion further concluded that the government failed to establish a "clear showing of the necessity of [Section 704(b)], the necessity required by exacting scrutiny," because other alternatives such as "counterspeech" and a database of Congressional Medal of Honor winners, could satisfy the government's interests. *Id.* at 2551.

Justice Breyer's concurring opinion, which was joined by Justice Kagan, agreed with the plurality's ultimate conclusion but declined to adopt the plurality's reasoning. Justice Breyer concluded that Section 704(b) violated the First Amendment because the government could "achieve its legitimate objec-

---

[23]The text of 18 U.S.C. § 704(b) provided as follows: "False Claims About Receipt of Military Decorations or Medals.— Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both."

[24]Justice Kennedy authored the plurality opinion in *Alvarez*, which was joined by Chief Justice Roberts, Justice Ginsburg, and Justice Sotomayor.

tives in less restrictive ways." *Id.* at 2551 (Breyer, J., concurring in judgment). In Justice Breyer's view, the government's failure to draft a more narrow statute rendered Section 704(b) unconstitutional.[25] *Id.* at 2555-56 (Breyer, J., concurring in judgment).

For the reasons discussed above, we conclude that the analyses employed in the plurality and concurring opinions in *Alvarez* are inapplicable here. Although the governmental interests underlying the insignia statutes and Section 704(b) are similar, those interests are more greatly affected with respect to the conduct-related prohibitions in the insignia statutes than the speech-related prohibitions in Section 704(b). Moreover, the less burdensome alternatives identified by the plurality and concurrence in *Alvarez*, such as counterspeech and the possibility of a government-created database of Congressional Medal of Honor winners, are less feasible and less effective to counter the appearance created by the wearing of military uniforms and unearned military honors at issue in this case.[26]

## IV.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

---

[25]Justice Alito's dissenting opinion in *Alvarez*, joined by Justice Scalia and Justice Thomas, proposed that false factual statements, in their own right, are entitled to no First Amendment protection whatsoever. *Alvarez*, 132 S. Ct. at 2560-63 (Scalia, J., dissenting). The dissent also disagreed with the plurality's and Justice Breyer's conclusions that other, less burdensome approaches would protect the government's interests. *Id.* at 2559-60 (Scalia, J., dissenting).

[26]We have considered the arguments made by Hamilton in his supplemental brief, filed after the Supreme Court issued its decision in *Alvarez*. We conclude that those arguments are without merit.

DAVIS, Circuit Judge, concurring:

I join in full Judge Keenan's thorough opinion for the panel. I write briefly to elaborate on the reasons I believe we are correct in the circumstances presented here to decline to follow the Ninth Circuit's application of the "relatively lenient" *O'Brien* standard of First Amendment scrutiny, *see United States v. Perelman*, ___ F.3d ___, 2012 WL 3667348 (9th Cir. Aug. 28, 2012) (amending and superseding opinion on denial of rehearing en banc of *United States v. Perelman*, 658 F.3d 1134 (9th Cir. 2011)) ("*Perelman II*"), to the insignia statutes at issue in this case.[1]

Judge Keenan correctly observes that, "as a general principle, expressive conduct is not entitled to the same degree of protection under the First Amendment as is pure speech." Ante at 21. The qualifier is important, however, as shown by the *Johnson* Court's extension of protection to those who communicate their message by burning our nation's flag; at the intersection of "pure speech" and "expressive conduct," differential treatment of the latter may not survive scrutiny under the First Amendment.

Included within the scope of protections afforded by the First Amendment, separate and apart from protection of polit-

---

[1]As Judge Keenan explains, we agree with the Ninth Circuit that an "intent to deceive" element must be imported into the "wearing" prohibitions of the insignia statutes to avoid a substantial overbreadth objection to the statutes. The upshot of this conclusion is that by definition, because the government must prove an intent to deceive, the prohibitions on "wearing" in the insignia statutes will only come into play when a defendant seeks to communicate a message, albeit a false message. *See* ante at 24; *see also infra* at 36-37. As Judge Keenan further explains, after *United States v. Alvarez*, ___ U.S. ___, 132 S.Ct. 2537 (2012), in the absence of a showing of fraud, or disruption (or a likelihood of disruption) to governmental or judicial processes, or of dignitary or other harm to another, false statements of fact undeniably enjoy First Amendment protection. Ante at 24 n. 14 (citing *Alvarez*, 132 S. Ct. at 2545-47 (plurality opinion); 2553-55 (Breyer, J., concurring in judgment)).

ical, artistic, and commercial speech, is the individual interest in "self-expression." As Chief Judge Kozinski aptly observed:

> Alvarez's conviction is especially troubling because he is being punished for speaking about himself, the kind of speech that is intimately bound up with a particularly important First Amendment purpose: human self-expression. As Justice Marshall explained:
>
>> The First Amendment serves not only the needs of the polity but also those of the human spirit—a spirit that demands self-expression. Such expression is an integral part of the development of ideas and a sense of identity. To suppress expression is to reject the basic human desire for recognition and affront the individual's self worth and dignity.
>
> *Procunier v. Martinez*, 416 U.S. 396, 427 (Marshall, J., concurring). Accordingly, the Court has recognized that "[o]ne fundamental concern of the First Amendment is to 'protec[t] the individual's interest in self-expression.'" *Citizens United v. FEC*, ___ U.S. ___, 130 S.Ct. 876, 972 (2010) (Stevens, J., concurring in part and dissenting in part) (quoting *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n*, 447 U.S. 530, 534 n. 2 (1980)) (second alteration in original). Speaking about oneself is precisely when people are most likely to exaggerate, obfuscate, embellish, omit key facts or tell tall tales. Self-expression that risks prison if it strays from the monotonous reporting of strictly accurate facts about oneself is no expression at all.

*United States v. Alvarez*, 638 F.3d 666, 674 (9th Cir. 2011) (Kozinski, J., concurring in the denial of rehearing en banc).

Thus, although the record before us does not reveal the etiology of Hamilton's disturbed belief that he is a highly-decorated military hero who attained the rank of colonel as a United States Marine, there can be no doubt that the conduct giving rise to his convictions under 18 U.S.C. §§ 702 and 704 constituted (deceitful) expressive conduct, i.e., "free expression."[2] Similarly, there can be no doubt that one of the governmental interests underlying the criminalization of Hamilton's expressive conduct is the government's compelling interest in prohibiting that very conduct, i.e., the very means of self-expression chosen by Hamilton.

So viewed, application of the four-part analysis from *O'Brien*, *see* ante at 17, rather than the "exacting scrutiny" approach of *Johnson*, *see id.*, to justify an affirmance in this case is untenable. At steps three and four of the *O'Brien* analysis, we are instructed to ask whether "the governmental interest [underlying the statute] is unrelated to the suppression of free expression," and whether "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). It is clear to me that because the answer at step three must be "no" on this record, and because (at step four) the infringement of Hamilton's rights by the insignia statutes is not merely "incidental," it is wholly improper to apply the standard articulated at step four. Consequently, application of *O'Brien* would compel reversal rather than affirmance of the convictions on counts three and four.

In *Perelman II*, the Ninth Circuit purported to apply *O'Brien* in affirming Perelman's conviction under § 704(a)

---

[2]In the context of this case, Hamilton's wearing of the uniform and medals was inherently and exclusively self-expressive; the "message" he conveyed to his audience by his attire did not require that he actually speak. *Cf. Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 64-66 (2006).

for wearing a Congressional Medal of Honor he had not earned. In doing so the court failed to appreciate the anomaly it created. The court reasoned that the insignia statute's prohibition on wearing an unearned medal is aimed solely at "conduct," or, perhaps, merely at speech that is "integral to criminal conduct." *See* 2012 WL 3667348, at *4 ("[I]n *Alvarez,* the Supreme Court distinguished examples such as impersonation statutes by explaining that they 'implicate fraud or speech integral to criminal conduct.' 132 S.Ct. at 2546. We conclude that wearing a military medal with an intent to deceive falls within that same category.").[3] But, as we hold, the prohibited "conduct" consists exclusively of protected "expressive conduct" and it is that expressive conduct at which the prohibition on "wearing" is directly aimed.

In dressing as he did, adorned with his unearned medals, Hamilton necessarily made "representations" to his audience, namely, false assertions about his (existent, but very different) past military service and his courage and valor in non-existent battles. *Cf. United States v. Alvarez,* ___ U.S. ___, 132 S. Ct. 2337, 2557 n.1 (2012) (Alito, J. dissenting) ("The Act's use of the phrase 'falsely represents,' moreover, connotes a knowledge requirement. *See* Black's Law Dictionary 1022 (8th ed. 2004) (defining a 'misrepresentation' or 'false representation' to mean '[t]he act of making a false or misleading assertion about something, usu. with the intent to deceive' (emphasis added)).")). Under the circumstances of this case, therefore, Hamilton's wearing the uniform and medals without authority was every bit as expressive as Alvarez's oral declaration that he had earned the Congressional Medal of Honor. What is at issue in both cases is a criminal enactment that is not simply potentially overbroad, but is a content-based prohibition on protected free expression.[4] Accordingly, the

(Text continued on page 39)

---

[3]In *Perelman,* the defendant wore only the medal, not a uniform. Thus, the only violation at issue in that case was of 18 U.S.C. § 704(a), (d); § 702 was not at issue, as it is here.

[4]Tellingly, at oral argument in *Alvarez,* both Justice Kennedy, who wrote the plurality opinion, and Justice Ginsburg, who joined it, antici-

pated the issue discussed in text and had the following exchanges with counsel for Alvarez:

> JUSTICE KENNEDY:   Well, it's a matter -- it's a matter of common sense that it, it seems to me -- that it demeans the medal. Let me ask you this: What do you do with the statute that prohibits the wearing of a medal that has not been earned?

> MR.   LIBBY:   Wearing medals is a slightly different category because there you're dealing with conduct rather than content.

> JUSTICE KENNEDY:   Well, I'm not so sure. You know, the *Tinker* case with the arm band; it's purely expressive speech, it seems to me. I think if you prevail here that the wearing prohibition must also be in serious doubt.

> MR. LIBBY:   It may be or it may be in doubt under certain situations where one is wearing a medal. But certainly Congress has an interest in protecting non-expressive purposes of wearing the medals.

> JUSTICE KENNEDY:   But I think it is, if the whole purpose of the person who puts the medal on his tuxedo that he didn't earn is an expressive purpose. That's pure expression.

> MR. LIBBY:   It may be, Your Honor. But again, we -- we view it under a different prism. We --

> JUSTICE GINSBURG:   Why? I mean, it's expressive. One is I am speaking through conduct, and the other is I'm speaking through words. You wear the medal and you're saying I am a Medal of Honor winner.

> MR. LIBBY:   That's right. And as I said, it may ultimately be the case that the Court finds that, if in fact it's unconstitutional --

> JUSTICE GINSBURG:   So, you think that the wearing --

> MR. LIBBY:   -- in this provision, that it could be.

> JUSTICE GINSBURG:   -- that the wearing of a military decoration that you haven't earned, that that's also of questionable consistency with the First Amendment?

> MR. LIBBY:   It may be. But, again, it would depend on the circumstances.

> JUSTICE GINSBURG:   No circumstances. Where you go out in the street with the -- with the medal on you for everybody to see.

"relatively lenient" *O'Brien* analysis no more applies to Hamilton's false expressive conduct about his military past than it would have applied to his words had he orally voiced the same falsehoods in the course of his speech to those assembled for the recognition ceremony in April 2010.[5] The propriety of the respective prohibitions, if any, on "pure speech" on the one hand, and on conduct that is inherently and exclusively expressive, on the other hand, hinges on the availability and fit of alternative means to protect the governmental interests at stake rather than on the level of scrutiny appropriate to the analysis. The level of scrutiny for each should be the same.

All this means that in *Perelman II* the Ninth Circuit reached the right result for the wrong reason. In seeking to avoid a strict or "exacting scrutiny" analysis, it misapprehended

---

MR. LIBBY:   If -- if there's -- if Congress does not have a non-speech purpose for prohibiting the wearing of the medals, then if it's strictly an expressive purpose, then, yes, there would be a significant First Amendment problem.

JUSTICE KENNEDY:   Well, don't you think that's the case? There's no non-expressive purpose that I can think of.

MR. LIBBY:   Well—and that very well may be. What I can say is in this case what we're dealing with is strictly a content-based regulation on speech.

Tr. of Oral Arg. 32-34 (Feb. 22, 2012).

[5]The Ninth Circuit's observation that "most of the activities banned in § 704(a) are not expressive, for example, buying and selling military medals and manufacturing replicas," 2012 WL 3667348, at *4 n. 5, is certainly true but also irrelevant in the circumstances here. As Judge Keenan's opinion for the panel makes clear, we deal only with the statutory prohibition on "wearing" the uniform and medals. *See* ante at 25 n. 15. The mere fact that other parts of the statutory scheme might survive under the more lenient *O'Brien* analysis does not provide a means of escaping the application of the more stringent *Johnson* analysis to the part of the statute challenged by Hamilton in this case.

*O'Brien* steps three and four. Specifically, the court erred in reasoning that

> [The government's compelling interests] are unrelated to the suppression of free expression because, unlike the implementing regulation at issue in *Schacht*, § 704(a) does not prevent the expression of any particular message or viewpoint. Instead, § 704(a) promotes compelling governmental interests by barring fraudulent conduct.

2012 WL 3667348, at *4. As already demonstrated, the government's interests are not "unrelated to the suppression of free expression."[6] Moreover, as to *O'Brien* step four, what Congress has done in its prohibition on unauthorized "wearing" of uniforms and medals is by no measure an "incidental restriction on alleged First Amendment freedoms." *O'Brien*, 391 U.S. at 307. Rather, as I have demonstrated, and contrary to the Ninth Circuit's hypothesis, it is precisely because the prohibitions on "wearing" uniforms and medals codified in the insignia statutes come into play only when a particularized deceitful "message" in the form of protected (even if false) self-expression is at issue, one of the government's interests is unavoidably focused on "the suppression of free expression." And, as Judge Keenan amply demonstrates, ante at 27-30, it is precisely because the government's compelling

---

[6]It is true, of course, that the government's interests underlying the insignia statutes are not *limited* to the suppression of free expression. But it seems to me to be quite a leap to interpret the requirement from *O'Brien* that to be permissible a regulation of expressive conduct should support an interest that is "unrelated to the suppression of free expression" as if it meant that the regulation is impermissible only where the government's interests are "limited to the suppression of free expression." In sum, the government will always pursue varied interests statutorily, but it is not clear to me how the government's interests can be described as "unrelated to the suppression of free expression" where Congress has directed criminal punishment directly at knowingly false, deceitful expressive conduct amounting solely to an individual's assertions concerning his own past military service.

interests cannot, in the absence of any plausible alternative means, protect its interests in the aggregate, the First Amendment interest of Hamilton in free self-expression must give way.

In short, as Judge Keenan persuasively demonstrates, proper application of "exacting scrutiny" under the circumstances of this case requires us to affirm Hamilton's convictions under 18 U.S.C. §§ 702 and 704. Affirmance is justified, not because Hamilton's rights are in any manner diminished, or because the infringement on his rights is "incidental," but because the government's interests are of a higher order in the constitutional calculus. Among the countless falsehoods that Hamilton is constitutionally entitled to communicate about himself in the exercise of his protected right of self-expression, deceitful expressive conduct employing a uniform of the United States military decorated with unearned military medals sanctioned by Congress is off the table, and Congress acted constitutionally in so concluding.