**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>ELVEN JOE SWISHER,<br>*Defendant-Appellant*.</td>
<td>No. 11-35796<br><br>D.C. Nos.<br>1:09-cv-00055-BLW<br>1:07-cr-00182-BLW-1<br><br>OPINION</td>
</tr>
</table>

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted En Banc
September 9, 2015—San Francisco, California

Filed January 11, 2016

Before: Sidney R. Thomas, Chief Judge and Stephen
Reinhardt, Alex Kozinski, M. Margaret McKeown, Marsha
S. Berzon, Richard R. Clifton, Jay S. Bybee, Sandra S.
Ikuta, N. Randy Smith, Jacqueline H. Nguyen and Paul J.
Watford, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Bybee

# SUMMARY[*]

## Criminal Law

Reversing the denial of a motion under 28 U.S.C. § 2255, the en banc court held that the reasoning in *United States v. Alvarez*, 132 S. Ct. 2537 (2012), invalidating on First Amendment grounds a statute prohibiting lying about being awarded military medals, also applied to 18 U.S.C. § 704(a) (2002 ed.), a provision of the Stolen Valor Act that previously criminalized the unauthorized wearing of such medals.

The en banc court held that the defendant's challenge to his conviction under § 704(a) was not barred by *Teague v. Lane*, 489 U.S. 288 (1989), because *Alvarez* was a decision holding that a substantive federal statute did not reach certain conduct, and thus could be applied retroactively. In addition, the government waived a procedural default defense based on the defendant's failure to raise his constitutional claim at trial or on direct appeal.

The en banc court held that § 704(a) regulated speech because wearing a medal conveys a message. The court held that § 704(a) was a content-based restriction of false symbolic speech because its purpose was to stop a particular message: the misappropriation or distortion of the message of valor conveyed by a medal. Accordingly, the tests applicable to content-neutral regulations did not apply.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Considering the intermediate-scrutiny standard set forth in Justice Breyer's concurring opinion in *Alvarez*, the en banc court interpreted § 704(a) as proscribing unauthorized persons from wearing military medals for the purpose of falsely communicating that they have been awarded such medals. The court held that this narrowing interpretation diminished the extent to which § 704(a) endangered First Amendment values, but the statute lacked limiting features such as a requirement of proof of specific harm to identifiable victims. Accordingly, under Justice Breyer's test, § 704(a) created a significant risk of First Amendment harm. The en banc court concluded that the government had a compelling interest in enacting § 704(a), but there were other, less restrictive ways of achieving those objectives.

The en banc court concluded that § 704(a) failed Justice Breyer's intermediate scrutiny test, and therefore also failed under the *Alvarez* plurality's exacting scrutiny test.

The en banc court overruled *United States v. Perelman*, 695 F.3d 866 (9th Cir. 2012), to the extent inconsistent with this opinion.

Dissenting, Judge Bybee, joined by Judges N.R. Smith and Watford, wrote that the defendant's conduct was not a form of speech entitled to the same protection as the speech in *Alvarez*, and that he would uphold the constitutionality of § 704(a) under Justice Breyer's intermediate-scrutiny analysis.

## COUNSEL

Joseph Theodore Horras, Boise, Idaho, for Defendant-Appellant.

John M. Pellettieri (argued), Attorney, Appellate Section; Leslie R. Caldwell, Assistant Attorney General; Sung-Hee Suh, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., for Plaintiff-Appellee.

## OPINION

IKUTA, Circuit Judge:

This appeal requires us to determine whether the reasoning in *United States v. Alvarez*, 132 S. Ct. 2537 (2012), which invalidated a statute prohibiting lying about being awarded military medals, *see* 18 U.S.C. § 704(b) (2011 ed.),[1] also applies to a statute criminalizing the unauthorized

---

[1] The then-applicable provision read:

> Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States . . . shall be fined under this title, imprisoned not more than six months, or both.

18 U.S.C. § 704(b) (2011 ed.).

wearing of such medals, *see* 18 U.S.C. § 704(a) (2006 ed.).**²**
We hold that it does, and therefore reverse the district court.**³**

---

**²** The provision read in full:

> Whoever knowingly wears, purchases, attempts to purchase, solicits for purchase, mails, ships, imports, exports, produces blank certificates of receipt for, manufactures, sells, attempts to sell, advertises for sale, trades, barters, or exchanges for anything of value any decoration or medal authorized by Congress for the armed forces of the United States, or any of the service medals or badges awarded to the members of such forces, or the ribbon, button, or rosette of any such badge, decoration or medal, or any colorable imitation thereof, except when authorized under regulations made pursuant to law, shall be fined under this title or imprisoned not more than six months, or both.

18 U.S.C. § 704(a) (2002 ed.).

Before we agreed to rehear this case en banc, § 704(a) was amended to remove the word "wears" from the list of prohibited actions with respect to decorations and medals authorized by Congress. *See* 18 U.S.C. § 704(a) (2013 ed.). That is, § 704(a) no longer prohibits the conduct for which Swisher was convicted. Because Swisher was convicted under the prior version of the statute, however, the case is not moot. *See Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) (holding that a challenge to a criminal conviction is not moot when the defendant continues to face adverse consequences from the conviction).

**³** Swisher's other claims were previously addressed in an unpublished memorandum disposition. *United States v. Swisher*, 585 F. App'x 605 (9th Cir. 2014). We agree with the three-judge panel's reasons for rejecting Swisher's other arguments, and we adopt them as our own.

I

Defendant Elven Joe Swisher enlisted in the United States Marine Corps on August 4, 1954, a little over a year after the Korean War ended. In August 1957, he was honorably discharged from the Marine Corps into the reserves. Upon discharge, Swisher was given a DD-214 discharge document, a typewritten form that provided his name, education, type of discharge, last duty assignment, last date of service, and similar information regarding his military service. The form required a listing of Swisher's "decorations, medals, badges, commendations, citations and campaign ribbons awarded or authorized." In the authenticated copy of Swisher's original DD-214, the term "N/A" (not applicable) is written in the field.

In 2001, more than forty years after his discharge, Swisher filed a claim for service-related Post-Traumatic Stress Disorder (PTSD). In his application, Swisher claimed he suffered from PTSD as a result of his participation in a secret combat mission in North Korea in August or September 1955. Along with his application, Swisher provided a self-published narrative that described the North Korea operation. According to the narrative, Swisher was wounded in battle, and subsequently presented with a Purple Heart by an unnamed captain who visited him in the hospital. The same captain told him he was "entitled to and should wear the National Defense Medal, Korean War Service Medal and the Korean War U.N. Service Medal and Ribbons." Swisher claims he also received a Silver Star and a Navy Commendation Medal and Ribbon with a Bronze "V."

After reviewing Swisher's application for PTSD benefits and the accompanying narrative, the VA denied the claim because Swisher failed to provide corroborating evidence beyond his own statement that his PTSD was service connected.

Swisher appealed the denial and submitted a photocopy of a second DD-214, which included the typewritten comment that "[t]his document replaces the previously issued transfer document" and "[c]hanges and additions have been verified by Command." The new form stated that Swisher had received the Silver Star, Navy and Marine Corps Medal with Gold Star, Purple Heart, and Navy and Marine Corps Commendation Medal with Bronze "V." Based on this information, the VA reversed its previous decision in July 2004, ruled that Swisher's PTSD was a compensable disability, and granted Swisher a total of $2,366 a month in benefits.[4]

About a year later, the VA received information from the military personnel division that the replacement DD-214 was fraudulent. In July 2006, after further investigation confirmed that the DD-214 was forged, the VA reversed its determination that the PTSD was service connected and required Swisher to pay back the PTSD benefits that he had received.

---

[4] Swisher's claim that he was awarded a Purple Heart became a key issue in a criminal trial involving defendant David Hinkson, who was on trial for solicitation of murder. *See United States v. Hinkson*, 585 F.3d 1247, 1254–57 (9th Cir. 2009) (en banc). The parties agreed that any evidence related to the Hinkson trial would be excluded from Swisher's trial.

In July 2007, a grand jury indicted Swisher for four violations of federal law:  (1) wearing unauthorized military medals in violation of 18 U.S.C. § 704(a); (2) making false statements to the VA regarding his military service, disabilities, and honors, in an effort to obtain benefits in violation of 18 U.S.C. § 1001(a)(2); (3) forging or altering his certificate of discharge, also in an effort to obtain benefits, in violation of 18 U.S.C. § 1001(a)(3); and (4) theft of government funds, in violation of 18 U.S.C. § 641.

During the one-week trial, Lieutenant Colonel Elaine Hensen, the assistant head for the Military Awards Branch at Headquarters Marine Corps, discussed her review of the Marine Corps files and her determination that the files contained no record of Swisher receiving or being awarded the Purple Heart or any other medal or award.  The government also introduced Exhibit 67, a photograph showing Swisher and another man in Marine Corps League uniforms.[5]  In the photograph, Swisher is wearing several military medals and awards, and shaking hands with a person in civilian garb.  The parties stipulated that the photograph was authentic.  Lt. Col. Henson testified that the photograph showed Swisher wearing the Silver Star, Navy and Marine Corps Ribbon, Purple Heart, Navy and Marine Corps Commendation Medal with a Bronze "V," and UMC Expeditionary Medal.  She reiterated that there was nothing "in the United States Marine Corps' files . . . to substantiate Mr. Swisher's entitlement to wear any of those awards."  In addition, Jeffrey Shattuck, the head of the Records Correspondence Section for the Personnel Management

---

[5] The Marine Corps League is a Congressionally chartered veterans organization that has its own Marine-related uniforms.  *See* 36 U.S.C. §§ 140101–04.

Support Branch of the Marine Corps, outlined in detail the numerous indicia of fraud on Swisher's replacement DD-214 that Swisher had used to verify his awards.

At the conclusion of the trial, the jury found Swisher guilty on all counts. The court imposed a below-guidelines sentence of 12 months and one day, with a three-year term of supervised release. We affirmed Swisher's conviction and sentence on appeal. *United States v. Swisher*, 360 F. App'x 784 (9th Cir. 2009).

Swisher subsequently challenged his conviction through a motion under 18 U.S.C. § 2255 and claimed that his conviction for wearing the medals violated the First Amendment under the reasoning of the Ninth Circuit's intervening decision in *United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010). The district court denied the motion and an appeal followed. *See United States v. Swisher*, 790 F. Supp. 2d 1215, 1245–46 (D. Idaho 2011); *United States v. Swisher*, 771 F.3d 514 (9th Cir. 2014).

While Swisher's appeal was pending, the Supreme Court affirmed our decision in *Alvarez*, and held that § 704(b) unconstitutionally infringes upon speech protected by the First Amendment. *See United States v. Alvarez*, 132 S. Ct. 2537 (2012). Nevertheless, we subsequently distinguished *Alvarez*, and held that § 704(a) survived First Amendment scrutiny. *United States v. Perelman*, 695 F.3d 866, 871–72 (9th Cir. 2012) (as amended). Bound by *Perelman*, a three-judge panel rejected Swisher's constitutional challenge to § 704(a). *Swisher*, 771 F.3d at 524. In his petition for rehearing, Swisher argued that § 704(a) was unconstitutional under the reasoning set forth in *Alvarez* and asked us to

overrule our contrary decision in *Perelman.* We took the case en banc to reconsider this issue.

II

We review de novo a district court's denial of relief to a federal prisoner under 28 U.S.C. § 2255. *United States v. Aguirre-Ganceda*, 592 F.3d 1043, 1045 (9th Cir. 2010). Section 2255 is a substitute for habeas corpus relief for federal prisoners, *see Davis v. United States*, 417 U.S. 333, 343 (1974), and allows a petitioner to file a motion to "vacate, set aside or correct" the petitioner's conviction or sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack," 28 U.S.C. § 2255(a).

In evaluating a § 2255 motion, we are not constrained by 28 U.S.C. § 2254(d), which precludes federal courts from granting habeas relief to a state prisoner with regard to any claim adjudicated on the merits unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent, or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Section 2255 does not have a similar restriction on review of claims by federal prisoners.

Although Swisher's challenge to his conviction is based on a Supreme Court decision decided after his conviction became final, we are not barred from considering his claim.

*Teague v. Lane*, 489 U.S. 288 (1989), generally precludes the application of "new constitutional rules of criminal procedure" to cases that "have become final before the new rules are announced." *Bousley v. United States*, 523 U.S. 614, 619–20 (1998) (internal quotation marks omitted). While *Teague* is applicable in the § 2255 context, *see United States v. Sanchez-Cervantes*, 282 F.3d 664, 667–68 (9th Cir. 2002), *Teague* does not bar the retroactive application of decisions holding "that a substantive federal criminal statute does not reach certain conduct," *Bousley*, 523 U.S. at 620. *Alvarez* is a substantive decision of that sort.

Nor does Swisher's failure to raise his constitutional claim at trial or on direct appeal prevent us from reviewing his claim. Although federal prisoners are generally barred from raising claims on collateral review that they could have raised on direct appeal, *see Bousley*, 523 U.S. at 621, the government can waive a procedural default defense by failing to raise it, *see United States v. Barron*, 172 F.3d 1153, 1156–57 (9th Cir. 1999) (en banc). Here, the government failed to raise the procedural default on appeal and does not dispute that it is waived.

III

To address Swisher's arguments, we begin with a review of the reasoning in *Alvarez* and our subsequent interpretation of *Alvarez* in *Perelman.*

A

*Alvarez* considered the appeal of a defendant who was convicted under § 704(b) for introducing himself at a public meeting with a series of lies, including the false statement

that "[b]ack in 1987, I was awarded the Congressional Medal of Honor." 132 S. Ct. at 2542 (Kennedy, J., plurality opinion). The defendant challenged his conviction on the ground that § 704(b) was invalid under the First Amendment. *Id.* He won on appeal, and the government petitioned for certiorari. *Id.*

Because § 704(b) criminalized specific statements based on their falsity, the government did not dispute that the statute imposed a content-based restriction on speech. Rather, the government argued that false statements had "no First Amendment value in themselves," *id.* at 2543, and so were protected "only to the extent needed to avoid chilling fully protected speech," *id*. The Supreme Court rejected the government's argument, and agreed that § 704(b) violated the First Amendment. *Id*. The Court could not, however, agree on the appropriate level of scrutiny for the sort of lies targeted by § 704(b). *Id.* at 2548 (Kennedy, J., plurality opinion), 2552 (Breyer, J., concurring).

Justice Kennedy, writing for four Justices, held that § 704(b) was subject to the "most exacting scrutiny." *Id.* at 2548 (Kennedy, J., plurality opinion) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)). In reaching this conclusion, the plurality rejected the government's argument that false statements had "no First Amendment value" and merited protection "only to the extent needed to avoid chilling fully protected speech." *Id*. at 2543. While conceding that "content-based restrictions on speech have been permitted" for certain historical categories of speech, *id.* at 2544, the plurality concluded that the "Government has not demonstrated that false statements generally should constitute a new category of unprotected speech." *Id.* at 2547. Nor did the plurality agree with the government's argument that

§ 704(b) was analogous to regulations on false speech "that courts generally have found permissible," such as laws prohibiting a false statement made to a Government official, laws punishing perjury, and prohibitions on falsely claiming to speak on behalf of the government. *Id*. at 2545–46. These examples, the plurality determined, were confined to circumscribed contexts. *Id.* at 2546. Certain statutes prohibiting impersonation of a government official, for instance, "protect the integrity of Government processes, quite apart from merely restricting false speech," and may be limited to "maintain[ing] the general good repute and dignity of . . . government . . . service itself." *Id.* at 2546 (quoting *United States v. Lepowitch*, 318 U.S. 702, 704 (1943) (alterations in original)). The plurality concluded that these types of permissible speech regulations did not encompass the "sweeping, quite unprecedented reach" of § 704(b). *Id.* at 2547.

Having concluded that false statements of the sort proscribed in § 704(b) constituted protected speech, the plurality subjected the statute to "exacting scrutiny," which required that (1) the government have a compelling interest; (2) "the Government's chosen restriction on the speech at issue be actually necessary to achieve its interest," and (3) "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." *Id.* at 2549 (internal quotation marks omitted). Applying this test to § 704(b), the plurality held that the statute served a compelling government interest in protecting "the integrity of the military honors system," *id.* at 2548, but the statute's restriction was not "actually necessary" because the government's interest could be satisfied by counterspeech, including a "Government-created database [that] could list Congressional Medal of Honor winners." *Id.* at 2549–51.

Further, the government had not shown "[t]he link between the Government's interest in protecting the integrity of the military honors system and the Act's restriction on the false claims of liars," because it failed to support "its claim that the public's general perception of military awards is diluted by false claims." *Id.* at 2549. Accordingly, the plurality concluded that § 704(b) violated the First Amendment. *Id.* at 2551.

Justice Breyer concurred in the judgment on the ground that § 704(b) "works disproportionate constitutional harm" under his formulation of intermediate scrutiny. *Id.* at 2556 (Breyer, J., concurring). In his concurrence, Justice Breyer stated that to determine whether a statute violates the First Amendment, the Court generally examines "the fit between statutory ends and means." *Id*. at 2551. In conducting a review of a governmental enactment under this standard, a court must (1) take "account of the seriousness of the speech-related harm the provision will likely cause"; (2) consider "the nature and importance of the provision's countervailing objectives," and (3) weigh "the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so." *Id.*

In applying this test to § 704(b), Justice Breyer first considered the "speech-related harm" caused by this enactment. *Id*. at 2551–52. Justice Breyer interpreted § 704(b) as "criminalizing only false factual statements made with knowledge of their falsity and with the intent that they be taken as true." *Id.* at 2552–53. He acknowledged that regulation of false statements "endangers First Amendment values" less than other restrictions, *id.* at 2553, and noted that "many statutes and common-law doctrines make the utterance of certain kinds of false statements unlawful," *id.* at 2253–54.

But in Justice Breyer's view, such statutes and doctrines work less speech-related harm because they typically "narrow the statute to a subset of lies where specific harm is more likely to occur." *Id.* at 2555. For instance, laws punishing fraud, defamation, or intentional infliction of emotional distress generally "requir[e] proof of specific harm to identifiable victims," and statutes prohibiting the impersonation of a public official "may require a showing that, for example, someone was deceived into following a 'course [of action] he would not have pursued but for the deceitful conduct.'" *Id.* at 2554 (alteration in original) (quoting *Lepowitch*, 318 U.S. at 704). Other similar laws specify "that the lies be made in contexts in which a tangible harm to others is especially likely to occur," such as laws punishing perjury or lying to a government official, or trademark statutes which are "focused upon commercial and promotional activities that are likely to dilute the value of a mark." *Id*. Finally, statutes prohibiting false claims of terrorist attacks or other lies about crimes or catastrophes, are limited to false statements that "are particularly likely to produce harm," and generally require proof of foreseeability of substantial public harm. *Id.*

According to Justice Breyer, § 704(b) lacked these narrowing features because it was not limited to a subset of lies causing specific harm to identifiable victims, or to a specific context where foreseeable harm to others is likely to occur. *Id.* at 2555–56. Because "[f]alse factual statements can serve useful human objectives" in a variety of contexts and "the threat of criminal prosecution" could have a chilling effect and could encourage or permit selective prosecution for political ends, *id.* at 2553, Justice Breyer concluded that § 704(b) "risks significant First Amendment harm," *id.* at 2555.

Having reached this conclusion, Justice Breyer then turned to consider "the nature and importance of the provision's countervailing objectives," *id*. at 2551, and concluded that § 704(b) has a "substantial countervailing objective" because "[i]t seeks to protect the interests of those who have sacrificed their health and life for their country," and is aimed at avoiding dilution of "the country's recognition of that sacrifice in the form of military honors," *id.* at 2555.

Finally, Justice Breyer turned to his third prong, consideration of "the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so." *Id.* at 2551. Here, Justice Breyer concluded that it was "possible substantially to achieve the Government's objective in less burdensome ways." *Id.* at 2555. According to Justice Breyer, Congress could enact a more limited statute that adopted some of the narrowing strategies used in other statutes and common law doctrines punishing false speech, such as (1) requiring a showing that the false statements caused a specific harm, (2) requiring that the lies be made in a context "where such lies are most likely to cause harm," or (3) focusing on the more important military awards that Congress most values. *Id.* at 2555–56. Such a more narrowly tailored statute could be combined with "information-disseminating devices," such as "an accurate, publicly available register of military awards, easily obtainable by political opponents." *Id*. at 2556. Because the government failed to explain why a more limited statute along with a method for providing more accurate information would not "significantly reduce the threat of First Amendment harm while permitting the statute to achieve its important protective objective," Justice Breyer concluded that "the statute as presently drafted works disproportionate

constitutional harm" and "so violates the First Amendment." *Id*.

B

In analyzing the constitutionality of § 704(b), *Alvarez* did not directly address the closely related section of the Stolen Valor Act, § 704(a), which is before us here. We first had occasion to consider a constitutional challenge to that section in *United States v. Perelman*, decided two months after the Supreme Court issued its opinion in *Alvarez*. 695 F.3d 866.

Before considering the applicability of *Alvarez*, *Perelman* considered the defendant's overbreadth challenge to § 704(a). *Perelman* rejected this argument by construing the statute narrowly as criminalizing only the unauthorized wearing of medals "when the wearer intends to deceive." *Id.* at 870 (emphasis omitted).

*Perelman* then considered whether § 704(a), as construed, would survive First Amendment scrutiny. Although the *Alvarez* plurality had applied "exacting scrutiny" to § 704(b), *Perelman* did not use this analytic framework because § 704(a) did not criminalize speech, but rather criminalized "the harmful *conduct* of wearing a medal without authorization and with intent to deceive." *Id.* at 871. *Perelman* reasoned that "[e]ven if we assume that the intentionally deceptive wearing of a medal contains an expressive element—the false statement that 'I received a medal'—the distinction between pure speech and conduct that has an expressive element separates this case from *Alvarez*." *Id*. Because, in *Perelman*'s view, § 704(a) criminalized conduct, it was more akin to the impersonation statutes discussed in *Alvarez*, or statutes prohibiting "the

unauthorized wearing of military uniforms." *Id.* at 872 (citing *Schacht v. United States*, 398 U.S. 58 (1970)).

Presumably because of its determination that § 704(a) primarily criminalized conduct, but without further analysis, *Perelman* applied the test set forth in *United States v. O'Brien*, 391 U.S. 367, 377 (1968) (upholding the conviction of a draft protester under a content-neutral law prohibiting knowing destruction of draft cards). 695 F.3d at 872. Applying *O'Brien*'s three-part test, *Perelman* first held that the government had "a compelling interest in 'preserving the integrity of its system of honoring our military men and women for their service and, at times, their sacrifice.'" *Id.* (quoting *Alvarez*, 617 F.3d at 1216). Second, the government's interests were "unrelated to the suppression of free expression" because the statute "does not prevent the expression of any particular message or viewpoint." *Id.* And third, "the incidental restriction on alleged First Amendment freedoms" was "no greater than is essential to the furtherance of that interest," because, "even if § 704(a) is not the most effective mechanism, in at least some measure it promotes the goals of maintaining the integrity of the military's medals and preventing the fraudulent wearing of military medals." *Id.* at 872–73. Accordingly, *Perelman* rejected the defendant's facial First Amendment challenge to § 704(a). *Id.* at 873.

IV

*Perelman* based its conclusion that § 704(a) did not violate the First Amendment on two grounds. First, *Perelman* distinguished between written or spoken speech on the one hand and expressive conduct on the other. *Id.* at 871. Second, *Perelman* implicitly determined that expressive conduct is per se subject to scrutiny under the test set forth in

*O'Brien*. *Id.* at 872. Our reconsideration of *Perelman* requires us to review both these issues regarding the First Amendment framework for analyzing communicative conduct.

A

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. While "[t]he First Amendment literally forbids the abridgment only of 'speech,'" the Supreme Court has "long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). A message "delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative," *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984), is symbolic speech that falls "within the scope of the First and Fourteenth Amendments." *Johnson*, 491 U.S. at 404; *see also Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999) ("Non-verbal conduct implicates the First Amendment when it is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." (quoting *Johnson*, 491 U.S. at 404)). For instance, "the wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment" and is "closely akin to 'pure speech.'" *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969). Similarly, the Court has "recognized the expressive nature of . . . a sit-in by blacks in a 'whites only' area to protest segregation," *Johnson*, 491 U.S. at 404 (citing *Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966)), and "of the wearing of American military

uniforms in a dramatic presentation criticizing American involvement in Vietnam," *id*. (citing *Schacht*, 398 U.S. 58).

While the Court has rejected the notion that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," *O'Brien*, 391 U.S. at 376, there is no doubt that the use of recognized symbols, such as emblems or flags, constitutes symbolic speech, *Johnson*, 491 U.S. at 404. "The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind," and "a primitive but effective way of communicating ideas." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943); *see also Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) ("Tattoos are generally composed of words, realistic or abstract images, symbols, or a combination of these, all of which are forms of pure expression that are entitled to full First Amendment protection."). In this context, the Court has frequently recognized "the communicative nature of conduct" relating to the American flag, which "as readily signifies this Nation as does the combination of letters found in 'America.'" *Johnson*, 491 U.S. at 405–06. Because "[t]he very purpose of a national flag is to serve as a symbol of our country," *id*. at 405, such acts as attaching a peace sign to the American flag, *Spence v. Washington*, 418 U.S. 405, 409–11 (1974), refusing to salute the flag, *Barnette*, 319 U.S. at 632–33, or burning the flag, *Johnson*, 491 U.S. at 405–06, constitute symbolic speech that "may find shelter under the First Amendment." *Id*. at 405.**[6]**

---

**[6]** The dissent's contention that courts should analyze laws burdening symbolic speech conveyed by a "physical emblem," such as a flag or a medal, differently than they analyze laws burdening oral or written speech,

In adjudicating a First Amendment challenge to a government enactment that regulates speech, the Supreme Court considers whether the enactment is content-based or content-neutral. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226–27 (2015). This threshold inquiry is the same for symbolic speech as it is for enactments that regulate spoken or written words. *See Johnson*, 491 U.S. at 403 (holding that if the conduct at issue is communicative in nature, the Court must first determine "whether the State's regulation is related to the suppression of free expression"). Even where an enactment "contains no explicit content-based limitation on the scope of prohibited conduct," *United States v. Eichman*, 496 U.S. 310, 315 (1990), a court must consider whether the law "suppresses expression out of concern for its likely communicative impact," *id*. at 317. *See also Nordyke v. King*, 319 F.3d 1185, 1189–90 (9th Cir. 2003) (rejecting a First Amendment challenge to an ordinance barring the possession of firearms on County-owned property because it was not aimed at the communicative impact of firearm possession).

If the purpose of a law regulating conduct is aimed at the conduct itself, rather than at the message conveyed by that conduct, the regulation is subject to the lesser scrutiny given to content-neutral restrictions. Put differently, lesser scrutiny applies if the government's interest in such a regulation "is unrelated to the suppression of free speech." *Clark*, 468 U.S. at 294. In such circumstances, and only in such circumstances, the *O'Brien* test is applicable. *See Doe v. Reed*, 586 F.3d 671, 678 (9th Cir. 2009) (assuming that signing a referendum petition is expressive conduct subject to

---

Dis. op. at 39–40, is inconsistent with these precedents. Indeed, the dissent cites no case supporting its views.

the *O'Brien* test); *Corales v. Bennet*, 567 F.3d 554, 567 (9th Cir. 2009) (analyzing "the school's policy of disciplining truancies and leaving campus without permission" under *O'Brien*'s "intermediate scrutiny applied to content-neutral rules of conduct."). To pass the *O'Brien* test, however, the regulation must be "narrowly drawn to further a substantial governmental interest." *Clark*, 468 U.S. at 294.[7]

On the other hand, where the government's aim *is* to regulate the message conveyed by expressive conduct, the content-neutral *O'Brien* test is not applicable. Nor may it be applied unless "the conduct itself may constitutionally be regulated." *Id*. As explained in *Johnson*, "[i]f the State's regulation is not related to expression, then the less stringent standard we announced in *United States v. O'Brien* for regulations of noncommunicative conduct controls," but "[i]f it is, then we are outside of *O'Brien*'s test" and the regulation must survive "under a more demanding standard." 491 U.S. at 403; *see also Spence*, 418 U.S. at 412, 414 n.8 (concluding that the state's interest in "preserving the national flag as an unalloyed symbol of our country" was directly related to expression, and accordingly "the four-step analysis of *United States v. O'Brien* is inapplicable"); *Nordyke*, 319 F.3d at 1189 (stating that if an ordinance barring the possession of firearms on County property is "related to the suppression of free expression" then a First Amendment challenge to the ordinance must be analyzed under *Johnson*; if not, the

---

[7] The test for "time, place, or manner restrictions" may also be applicable to a content-neutral regulation of symbolic conduct. *Clark*, 468 U.S. at 293. There is, however, "little, if any, differen[ce]" between the two tests. *See Clark*, 468 U.S. at 298; *see also Vlasak v. Super. Ct. of Cal.*, 329 F.3d 683, 691 (9th Cir. 2003) (noting that *O'Brien* is "nearly identical to the time, place and manner test"). Because *Perleman* applied *O'Brien*, we focus on the *O'Brien* standard.

*O'Brien* test applies.). Accordingly, if a government enactment is "directed at the communicative nature of conduct" then it is content-based, and "must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires." *Johnson*, 491 U.S. at 406 (emphasis omitted) (quoting *Cmty. for Creative Non-Violence v. Watt*, 703 F.2d 586, 622–623 (D.C. Cir. 1983) (Scalia, J., dissenting), *rev'd sub nom. Clark*, 468 U.S. 288).

The Supreme Court has recently provided authoritative direction for differentiating between content-neutral and content-based enactments. *See Reed*, 135 S. Ct. at 2226–27. *Reed* explained that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 2227. If "a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys," it is a content-based regulation. *Id.* Laws that are facially content-neutral, but "cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys," are also content-based and subject to scrutiny under a higher standard. *Id*. (alteration in original) (internal quotation marks and citation omitted). Government regulations of symbolic speech frequently fall into this second category of content-based prohibitions. For instance, where a state prohibited burning the American flag because it might lead people to believe that the flag does not stand for the positive concepts of "nationhood and national unity," the Court was quick to conclude that such "concerns blossom only when a person's treatment of the flag communicates some message, and thus are related to the suppression of free expression." *Johnson*, 491 U.S. at 410 (internal quotation

marks omitted).  Such a content-based regulation is "outside of *O'Brien*'s test altogether."  *Id.*

Even if a challenged restriction is content-based, it is not necessarily subject to strict scrutiny.  Although "[c]ontent-based regulations are presumptively invalid," the Court "has permitted restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992) (internal quotation marks omitted) (indicating that obscenity, defamation, and fighting words fall within this category).  Both the plurality and concurring opinions in *Alvarez* recognized the existence of "historical" and traditional categories of content-based restrictions that are not subject to strict scrutiny under the First Amendment and which courts have generally found permissible.  *Alvarez*, 132 S. Ct. at 2544 (Kennedy, J., plurality opinion) (explaining that content-based restrictions on speech have been permitted only for a "few historic and traditional categories" of speech, including incitement, obscenity, defamation, speech integral to criminal conduct, so-called "fighting words," child pornography, fraud, true threats, and "speech presenting some grave and imminent threat the government has the power to prevent"); *id.* at 2553–54 (Breyer, J., concurring) (internal quotation marks omitted) (referencing additional "statutes and common-law doctrines" that make "utterance of certain kinds of false statements unlawful," including torts involving intentional infliction of emotional distress, lying to a government official, false claims of terrorist attacks or other lies about the commission of crimes or catastrophes, impersonation of an officer, and trademark infringement, among others).

B

Applying these principles to Swisher's facial challenge to § 704(a), we first ask whether this statute regulates speech. It clearly does. According to the government, the purpose of a military medal is to communicate "that the recipient has served the military efforts of the United States with valor, exceptional duty, or achievement worthy of commendation." The value of a military medal lies not in the materials of which it is comprised, but in its message; it is "a primitive but effective way of communicating ideas," *Barnette*, 319 U.S. at 632. Wearing a medal, like wearing a black armband or burning an American flag, conveys a message "by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative," *Clark*, 468 U.S. at 294. Specifically, wearing a medal communicates that the wearer was awarded that medal and is entitled to the nation's recognition and gratitude "for acts of heroism and sacrifice in military service." *Alvarez*, 132 S. Ct. at 2548 (Kennedy, J., plurality opinion) (internal quotation mark omitted). Wearing a medal without authorization, therefore, generally communicates the false message that the wearer is entitled to such recognition and gratitude. Because wearing a medal is symbolic speech, and § 704(a) precludes the unauthorized wearing of a medal, we conclude that § 704(a) regulates speech.

We next determine whether § 704(a) is a content-based or content-neutral restriction of symbolic speech. *See Johnson*, 491 U.S. at 403. As in *Johnson*, the purpose of § 704(a) is to stop a particular message: the misappropriation or distortion of the message of valor conveyed by a medal. *See Alvarez*, 132 S. Ct. at 2549 (noting the government's argument that the purpose of the Stolen Valor Act is to avoid diluting "the value

and meaning of military awards"). Because these "concerns blossom," *Johnson*, 491 U.S. at 410, only when a person's unauthorized wearing of a medal communicates a false message, we conclude that § 704(a) "suppresses expression out of concern for its likely communicative impact," *Eichman*, 496 U.S. at 317, and is a content-based restriction on speech.

As such, the tests applicable to content-neutral regulations (the time, place, or manner test, and the *O'Brien* test) are not applicable here. *Johnson*, 491 U.S. at 410 (stating that a content-based regulation is "outside of *O'Brien*'s test altogether"). Instead, § 704(a) "must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires," *Johnson*, 491 U.S. at 406. In light of this analysis, we conclude that *Perelman* erred in applying the test set forth in *O'Brien*, which applies only to content-neutral enactments.[8]

C

Because § 704(a) is a content-based regulation of false symbolic speech, it is closely analogous to § 704(b). Indeed,

---

[8] *United States v. Hamilton*, 699 F.3d 356 (4th Cir. 2012), engaged in a similar analysis, correctly noting that "the key factor that determines whether we apply the 'relatively lenient' test employed in *O'Brien*, or the 'most exacting scrutiny' standard set forth in *Johnson*, is whether the statute being reviewed is related to the suppression of free expression." *Id*. at 370. The Fourth Circuit further acknowledged that when § 704(a) is construed as requiring an intent to deceive, it "could reach conduct that solely involves free expression, within the holding of *Johnson*." *Id*. at 371. The Fourth Circuit ultimately did not determine whether § 704(a) was symbolic speech because it concluded, erroneously in our view, that § 704(a) survived strict scrutiny. *See id*.

both statutes bar lies about having received a military medal. Accordingly, we review the constitutionality of § 704(a) under the tests enunciated in the plurality and concurring opinions in *Alvarez*. If they apply to § 704(a) in the same manner as they apply to § 704(b), the reasoning of *Alvarez* requires us to hold that § 704(a) is also unconstitutional.

We begin by considering the standard set forth in Justice Breyer's concurring opinion, which reviewed the constitutionality of § 704(b) under a less demanding test than the plurality required. As a threshold matter, Justice Breyer interpreted § 704(b) favorably to the government as proscribing "only false factual statements made with knowledge of their falsity and with the intent that they be taken as true." *Alvarez*, 132 S. Ct. at 2552–53 (Breyer, J., concurring). We adopt the same narrowing construction of § 704(a), and interpret it as proscribing unauthorized persons from wearing military medals for the purpose of falsely communicating that they have been awarded such medals. *See also Perelman*, 695 F.3d at 871 (concluding that a person violates § 704(a) only "if he or she has an intent to deceive").

The first prong of Justice Breyer's intermediate scrutiny test requires consideration of "the seriousness of the speech-related harm the provision will likely cause." *Alvarez*, 132 S. Ct. at 2551. Justice Breyer noted that the narrowing interpretation of § 704(b) "diminishes the extent to which the statute endangers First Amendment values." *Id*. at 2553. Because we have adopted the same narrowing interpretation for § 704(a), the same conclusion applies.[9]

---

[9] Because both § 704(a), *see supra* at 26–27, and § 704(b), *see Alvarez*, 132 S. Ct. 2552–53, prohibit only lies made knowingly and with an intent to deceive, both provisions impose an identical speech-related harm:

But like § 704(b), § 704(a) lacks the limiting features that, in Justice Breyer's view, justified other statutes and common law doctrines punishing the communication of false statements. *Id.* at 2553–54. Section 704(a) does not require "proof of specific harm to identifiable victims," or that "someone was deceived into following a course [of action] he would not have pursued but for the deceitful conduct," or specify "that the lies be made in contexts in which a tangible harm to others is especially likely to occur." *See id.* at 2254 (alteration in original) (internal citations and quotation marks omitted). Nor is § 704(a) limited to false statements that "are particularly likely to produce harm." *See id.* Accordingly, we conclude that under Justice Breyer's test, § 704(a), like § 704(b), "creates a significant risk of First Amendment harm." *Id.* at 2555.

Arguing against this conclusion, the government asserts that § 704(a) is analogous to statutes prohibiting trademark infringement such as the Lanham Act, since it prevents misappropriation of governmental property. Justice Breyer rejected a similar argument, concluding that § 704(b) had a broader reach than trademark statutes, which are typically "focused upon commercial and promotional activities that are likely to dilute the value of a mark," and would "typically require a showing of likely confusion, a showing that tends to assure that the feared harm will in fact take place." *Id.* at

---

burdening the speech of a person who intentionally chooses to lie, *see Alvarez*, 132 S. Ct. at 2555–56. And in prosecuting either statute, the government would be required to prove beyond a reasonable doubt that the defendant had the requisite mens rea. Therefore, we reject the dissent's argument that § 704(b) would have a greater chilling effect and pose a greater risk of selective prosecution than § 704(a) because a person could thoughtlessly lie but could not thoughtlessly wear an unauthorized medal. Dis. op. at 41.

2554. Because § 704(a) has the same broad reach as § 704(b), and likewise does not require that a specified harm (such as public confusion) will take place, the same analysis applies here, and we likewise reject the government's contention.

In reaching the conclusion that suppressing a symbolic communication threatens the same First Amendment harm as suppressing a spoken communication, we again part ways with *Perelman.* Although *Perelman* distinguished § 704(a) from § 704(b) on the ground that "[t]he use of a physical object goes beyond mere speech and suggests that the wearer has proof of the lie, or government endorsement of it," 695 F.3d at 871, we see no basis for *Perelman*'s conclusion that wearing a medal is more probative than speaking a lie. *Cf.* Kevin Jon Heller, *The Cognitive Psychology of Circumstantial Evidence*, 105 Mich. L. Rev. 241, 248–52 (2006) (noting, as an empirical matter, that jurors give more weight to testimony, such as eyewitness identifications and confessions, than to physical evidence, such as blood and fingerprints). As a practical matter, the government's concession at oral argument that military medals are freely available for purchase confirms that the probative value of owning a medal or other military decoration is minimal. In any event, wearing a medal has no purpose other than to communicate a message. We therefore see no principled basis for distinguishing a spoken communication from a symbolic communication in this context.

We also reject *Perelman*'s reasoning that § 704(a) is like the statutes described in *Alvarez* that prohibit impersonation of government officials, like 18 U.S.C. § 912, or the unauthorized wearing of military uniforms, like 18 U.S.C. § 702, which the Court assumed (without deciding) was valid.

*See* 695 F.3d at 872 (citing *Schacht*, 398 U.S. at 61). As Justice Breyer pointed out, "[s]tatutes forbidding impersonation of a public official typically focus on *acts* of impersonation, not mere speech, and may require a showing that, for example, someone was deceived into following a course [of action] he would not have pursued but for the deceitful conduct." *Alvarez*, 132 S. Ct. at 2554 (Breyer, J., concurring) (alteration in original) (internal quotation marks omitted). But § 704(a), like § 704(b), requires no act beyond the false communication itself. While there is a quantum of conduct involved in pinning on a medal, it is not materially different from the quantum of conduct involved in speaking or writing. Nor does § 704(a) require proof that anyone was deceived into taking a course of action. We also reject *Perelman*'s reliance on *Schacht* to support its conclusion that § 704(a) survives First Amendment scrutiny. *Schacht* itself merely held that *even if* the government could constitutionally prohibit a person from wearing a military uniform without authorization, Congress may not make "it a crime for an actor wearing a military uniform to say things during his performance critical of the conduct or policies of the Armed Forces." 398 U.S. at 62–63; *see also R.A.V.*, 505 U.S. at 430–31 (interpreting *Schacht* as precluding viewpoint discrimination). Neither *Schacht* nor any other Supreme Court case examined a First Amendment challenge to statutes precluding wearing military uniforms without authorization, and both the *Alvarez* plurality and concurring opinion indicated that laws prohibiting impersonation of an officer are distinguishable from false claims of entitlement to a military

medal. *See Alvarez*, 132 S. Ct. at 2546 (Kennedy, J., plurality opinion); *id.* at 2254 (Breyer, J., concurring).[10]

The second prong of Justice Breyer's intermediate scrutiny test requires an evaluation of "the nature and importance of the provision's countervailing objectives." *Id.* at 2551. We conclude that the government had the same compelling interest in enacting § 704(a) as it did in enacting § 704(b): in both cases, the government has a "substantial countervailing objective" of avoiding dilution of "the country's recognition of [award recipients'] sacrifice in the form of military honors." *Id.* at 2555; *see also Hamilton*, 699 F.3d at 371 ("Accordingly, we hold that the government's interest in preserving the integrity of the system honoring military members for their achievements and sacrifices is compelling.").[11]

Finally, we consider the third prong of Justice Breyer's test: "the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so." *Alvarez*, 132 S. Ct. at 2551. As explained in *Alvarez*, Congress could adopt narrowing strategies to limit

---

[10] Contrary to the dissent, our analysis does not necessarily invalidate 18 U.S.C. § 709. *Cf.* Dis. op at 37–38. Because § 709 is limited to precluding false representations in certain limited contexts (such as in the field of banking, finance, or law enforcement) where "a tangible harm to others is especially likely to occur," *Alvarez*, 132 S. Ct. at 2554 (Breyer, J., plurality opinion), it is distinguishable from § 704(a).

[11] We are sympathetic to the dissent's description of the government's powerful interest in protecting the message of valor and heroism that is conveyed by a medal. Dis. op. at 43–46. But because we already conclude that the government's interest in preventing the wearing of unauthorized medals is compelling, the dissent's further elaboration does not affect our First Amendment analysis.

the breadth of the prohibition, and could establish "information-disseminating devices," such as "an accurate, publicly available register of military awards, easily obtainable by political opponents." *Id*. at 2556. These alternative means to meeting the government's goals in enacting § 704(b) would be equally effective to meet the government's stated goals for § 704(a), namely to preserve the integrity of the military honors system and protect the symbolic value of military medals.[12]

Given that the statute fails Justice Breyer's intermediate scrutiny test, it also fails under the plurality's exacting scrutiny test. *See id*. at 2543 (Kennedy, J., plurality opinion).[13] The plurality's conclusion that the compelling interest served by § 704(b) could be satisfied by a database of medal winners, and that there is an insufficient causal link between the government's compelling interest and the restriction "on the false claims of liars," is equally applicable to § 704(a). *See id*. at 2549–50.

---

[12] The dissent's arguments to the contrary, *see* Dis. op. at 47–48, are based on its view that symbolic speech involving a physical emblem is qualitatively different than spoken or written speech, a position inconsistent with *Johnson.* 491 U.S. at 403–04. For the same reason, we disagree with *Hamilton*'s conclusion that § 704(a) survives strict scrutiny because a database is inadequate to counter symbolic speech involving a physical object. 699 F.3d at 373.

[13] Although *Alvarez* lacked a majority opinion, we need not determine whether the plurality opinion or Justice Breyer's opinion constitutes the holding of the Court, *see Marks v. United States*, 430 U.S. 188, 193 (1977), because we reach the same conclusion under either standard.

V

*Alvarez* clarified that lies do not fall into a category of speech that is excepted from First Amendment protection. 132 S. Ct. at 2546–47 (Kennedy, J., plurality opinion); *id*. at 2553 (Breyer, J., concurring). Given that clarification, our analysis follows a familiar road. Content-based prohibitions of speech and symbolic speech are analyzed under the same framework, and so *Alvarez* dictates our conclusion that § 704(a) violates the First Amendment. Because § 704(a) was unconstitutionally applied to Swisher's conduct, the district court erred in denying Swisher relief under 28 U.S.C. § 2255. We therefore reverse the district court and overrule *Perelman* to the extent inconsistent with this opinion.[14]

**REVERSED.**

---

[14] The government also argues that § 704(a) is not subject to the First Amendment because military medals convey government speech. In support, the government relies on *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, which held that Texas could reject a proposed design for specialty license plates without violating the First Amendment because license plate designs constitute government speech. 135 S. Ct. 2239, 2243–45 (2015). But § 704(a) does not regulate the design of military medals or other government speech; rather, it punishes an individual's false communication regarding the entitlement to wear a military medal. As such, *Walker* does not help the government here.

BYBEE, Circuit Judge, dissenting, with whom N.R. SMITH and WATFORD, Circuit Judges, join:

Xavier Alvarez announced in a public meeting that he was a former Marine and had been awarded the Congressional Medal of Honor. When the United States prosecuted Alvarez for "falsely represent[ing] himself . . . verbally" as having received a military decoration or medal, 18 U.S.C. § 704(b) (2011 ed.), the Supreme Court held that his speech was protected by the First Amendment. *United States v. Alvarez*, 132 S. Ct. 2537, 2551 (2012) (Kennedy, J.) (plurality opinion); *id.* at 2556 (Breyer, J., concurring in the judgment). Elven Swisher took Alvarez one step better: he not only said he was a decorated soldier, he proved it by wearing his Marine Corps League uniform with five medals—including a Silver Star, a Purple Heart, and the Navy and Marine Corps Commendation Medal with a bronze "V." Like Alvarez, Swisher was an undeserving claimant; although a veteran, he had not earned a single one of the commendations he wore. As in *Alvarez*, the United States indicted Swisher under the Stolen Valor Act, but this time it accused him of violating § 704(a), which prohibits "knowingly wear[ing] . . . any decoration or medal authorized by Congress . . . except when authorized." 18 U.S.C. § 704(a) (2002 ed.).

The majority today holds that Swisher's *conduct* is a form of *speech* entitled to the same protection as Alvarez's actual speech. I beg to differ. The Supreme Court's decision in *Alvarez* does not compel the result here. The law has always been able to tell the difference between conduct and speech, even when the conduct may have some communicative value. I respectfully dissent.

I

*Alvarez* held that false statements are not *categorically* unprotected by the First Amendment. *Alvarez*, 132 S. Ct. at 2545–47 (Kennedy, J.) (plurality opinion); *id.* at 2552–53 (Breyer, J., concurring in the judgment). As Justice Breyer explained, the government can have little interest in policing the "white lies" we tell to "provide the sick with comfort, or preserve a child's innocence," or false statements made "in technical, philosophical, and scientific contexts, where . . . examination of a false statement . . . can promote a form of thought that ultimately helps realize the truth." *Id.* at 2553 (Breyer, J., concurring in the judgment). But the Court stopped well short of protecting lying generally. As Justice Kennedy reminded us, "there are instances in which the falsity of speech bears upon whether it is protected." *Id.* at 2546 (plurality opinion).

The statute at issue here, however, does not police "white lies," nor does it prohibit lying generally. Instead, it targets a very specific lie that implicates a very specific government interest, an interest which the full court here and the Supreme Court in *Alvarez* agrees is significant. And importantly, the lie the government wishes to punish cannot be uttered with words; it can only be accomplished by falsely wearing the nation's medals. Although the Court in *Alvarez* found that the harm caused by the form of the lie regulated by § 704(b) did not outweigh the First Amendment harm, the interests implicated by § 704(a) must be weighed differently from those at issue in *Alvarez* under § 704(b). The harm to the government's interest in upholding the military honors system caused by the false *wearing* of its medals is greater than the harm caused by "bar stool braggadocio." *Alvarez*, 132 S. Ct. at 2555 (Breyer, J., concurring in the judgment).

Concomitantly, because § 704(a) requires proof of deceptive *conduct*, any harm to First Amendment interests is less than in *Alvarez*, and the less restrictive alternatives discussed in *Alvarez*, less effective.

The majority today ignores these distinctions, and discusses the outcome of this case as though *Alvarez* renders it a foregone conclusion. But it is not. *Alvarez* does not clearly compel the result here—indeed, that was the conclusion reached by a panel of our court in *United States v. Perelman*, 695 F.3d 866, 872–73 (9th Cir. 2012), in which we upheld § 704(a) under the lesser scrutiny applied to conduct regulations laid out in *O'Brien*.[1] It was also the conclusion reached by the Fourth Circuit, which found that § 704(a) would survive *strict* scrutiny. *United States v. Hamilton*, 699 F.3d 356, 371–74 (4th Cir. 2012). While I do not entirely agree with the reasoning in these cases, they demonstrate that the reach—and indeed the holding—of *Alvarez* is unclear. *Alvarez* gives uncertain guidance as to how false statements should be analyzed, especially if Justice Breyer's opinion controls under *Marks v. United States*, 430 U.S. 188, 193 (1977).[2] Justice Breyer, writing for himself and Justice Kagan, applies what he describes as "intermediate scrutiny," *Alvarez*, 132 S. Ct. at 2556, although without really explaining why that is the proper test.

---

[1] *United States v. O'Brien*, 391 U.S. 367 (1968).

[2] Justice Kennedy, writing for himself and three others, applies strict scrutiny to § 704(b)'s "content-based restrictions." *Alvarez*, 132 S. Ct. at 2548 (Kennedy, J.) (plurality). In dissent, Justice Alito, joined by two others, would have held that Alvarez's false statement "merit[ed] no First Amendment protection." *Id.* at 2563 (Alito, J., dissenting). Justice Breyer's opinion is the narrowest opinion that a majority of the Court agreed upon. *Marks*, 430 U.S. at 193.

Part of the analytical challenge of *Alvarez* is trying to understand why intermediate scrutiny applies. In *Perelman*, the panel used the *O'Brien* test. 695 F.3d at 872. I can't agree with the *Perelman* panel on that point because § 704(a) seems to violate at least one prong of *O'Brien:* The Government's interest in § 704(a) is not "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377; *see also Texas v. Johnson*, 491 U.S. 397, 410 (1989). For that reason, the Fourth Circuit did not apply *O'Brien*, but ultimately concluded the statute would survive strict scrutiny. *Hamilton*, 699 F.3d at 371. The anomaly is, as Judge Davis pointed out, that § 704(a) survives strict scrutiny, but would fail *O'Brien*'s version of intermediate scrutiny. *Id.* at 377 (Davis, J., concurring).[3]

Despite this ambiguity, the majority goes out of its way to extend *Alvarez* where it does not clearly apply. Moreover, the majority fails to consider the consequences of our decision. In addition to creating an unnecessary split with the Fourth Circuit over a statute that is no longer in effect,[4]

---

[3] In my view, § 704(a) should be reviewed under intermediate scrutiny and treated as an "impersonation of a war hero" statute. *See Alvarez*, 132 S. Ct. at 2554 (Breyer, J., concurring in the judgment) (noting that § 704(b) differs from anti-impersonation statutes because they typically prohibit "*acts* of impersonation, not mere speech" ); *see also id.* at 2553–55 (discussing examples of the "many statutes and common-law doctrines [that] make the utterance of certain kinds of false statements unlawful"). Unlike § 704(b), we deal here with something more than "mere speech."

[4] Both provisions of the Stolen Valor Act were amended following *Alvarez*, subsequent to the events that gave rise to Swisher's case. Congress removed the "wearing" provision in § 704(a), apparently preemptively, and more substantively revised § 704(b) to comply with the Court's holding in *Alvarez*. *See* Stolen Valor Act of 2013, Pub. L. No.

today's decision calls into question the validity of numerous other statutes that prohibit, for example: the unauthorized wearing of a military uniform, 18 U.S.C. § 702—which the Supreme Court has noted is "a valid statute on its face," *Schacht v. United States*, 398 U.S. 58, 61 (1970); the unauthorized use of the name of federal agencies, 18 U.S.C. § 709; or the impersonation of a federal officer, 18 U.S.C. § 912—a statute we upheld in *United States v. Tomsha-Miguel*, 766 F.3d 1041, 1048–49 (9th Cir. 2014), a case in which we relied on *Perelman* (which we now overturn).[5] In light of this, I see no reason to extend *Alvarez* to § 704(a), in order to protect deceptive conduct that has no First Amendment value, and which poses greater harm to the government's significant interest in upholding the military honors system than did the speech covered by § 704(b).

---

113-12, § 2, 127 Stat. 448 (2013). Thus, the precise provisions at issue here are no longer in effect. As amended, however, the statute would still appear to cover Swisher's conduct. Section 704(b) now reads: "Whoever, with intent to obtain money, property, or other tangible benefit, fraudulently holds oneself out to be a recipient of a decoration or medal . . . shall be fined under this title, imprisoned not more than one year, or both." 127 Stat. 448.

[5] Consider also: 18 U.S.C. § 703 (unauthorized wearing of a uniform of a friendly nation); § 706 (wearing of Red Cross with the fraudulent purpose of inducing the belief that wearer is a member or agent of the Red Cross); and § 706a (wearing of Geneva distinctive emblem (Red Crescent or Red Crystal) with fraudulent purpose of inducing the belief that wearer is a member or agent of an authorized national society using the emblem, the International Committee of the Red Cross, or the International Federation of Red Cross and Red Crescent Societies).

## II

The majority concludes that the Supreme Court's decision in *Alvarez* dictates the outcome of this case, identifying three factors from Justice Breyer's concurring opinion in *Alvarez*, and mechanically applying them to the statute at issue here. Maj. Op. at 26–32. For the reasons I have explained, I agree with the majority that Justice Breyer's analysis controls and that the relevant factors are: (1) "the seriousness of the speech-related harm the provision will likely cause"; (2) "the nature and importance of the provision's countervailing objectives"; and (3) "the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so." *Alvarez*, 132 S. Ct. at 2551. Yet in applying these factors, the majority fails to account for the crucial differences between § 704(b) and § 704(a)—and indeed, fails to engage in much critical analysis at all. I am going to address each of the factors in turn.

## A

In analyzing the speech-related harm caused by § 704(a), the majority concludes that § 704(a) works the same speech-related harm as § 704(b) because it "lacks the limiting features that, in Justice Breyer's view, justified other statutes and common law doctrines punishing the communication of false statements." Maj. Op. at 28. I have two points. First, I part ways with the majority's premise that speech and communicative conduct are the same for First Amendment purposes. In *O'Brien*, the Supreme Court rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaged in the conduct intends thereby to express an idea." 391 U.S. at 376. Here, the

majority doesn't just blur the lines between conduct and speech, it simply erases them: It finds that the "quantum of conduct involved in pinning on a medal . . . is not materially different from the quantum of conduct involved in speaking or writing." Maj. Op. at 30. With all respect, that just isn't true. If it were, then we could save ourselves trouble and money by simply announcing that we are awarding medals without actually giving the recipients anything. But as anyone knows who has witnessed the President awarding the Congressional Medal of Honor or a promotion ceremony pinning a new officer—or even an Olympic medals ceremony or a Cub Scout court of honor—there is value, both symbolic and tactile, in the awarding of a physical emblem. If there is important value in the act of awarding a physical medal, there is important value in the wearing of it.[6]

---

[6] The majority notes, twice, that distinguishing between pure speech, like false statements, and "symbolic speech" conveyed through conduct, like the unauthorized wearing of a military medal, is inconsistent with *Texas v. Johnson*, 491 U.S. 397 (1989). Maj. Op. at 20–21 n.6, 32 n.12. This reference to *Johnson* is puzzling. *Johnson* is relevant only if we must analyze this statute under strict scrutiny as a content-based restriction on speech. *See Johnson*, 491 U.S. at 411–12 (applying strict scrutiny to a statute prohibiting the burning of the American flag). But Justice Breyer's concurrence in *Alvarez*, on which the majority bases its entire analysis, clearly departs from this traditional First Amendment framework, analyzing restrictions on false speech under an intermediate scrutiny, balancing-of-interests approach Justice Breyer refers to as "proportionality." *Alvarez*, 132 S. Ct. at 2551–52 (Breyer, J., concurring in the judgment). Moreover, as I have already noted, in analyzing false speech, Justice Breyer specifically distinguishes between "mere speech" and "*acts* of impersonation where an act of impersonation is more likely to cause harm. *Id.* at 2554 (emphasis in original). *Johnson* is irrelevant here.

Second, even if there isn't a relevant difference in content between the lie represented by saying one has a medal and the deceit communicated by actually wearing it, the majority never grapples with the speech-related harms that Justice Breyer focused on in striking down § 704(b), and therefore fails to consider whether there is any difference between the two situations that alters the need for the "limiting features" discussed in *Alvarez*.   For example, Justice Breyer was particularly concerned with the potential chilling effect of § 704(b), because individuals would worry about "being *prosecuted* for a careless false statement" even if they lacked the requisite mens rea, and so would curtail their own speech. *Alvarez*, 132 S. Ct. at 2555.  It makes little sense, however, to extend this principle—that people sometimes thoughtlessly say things that they don't really mean—to the context of § 704(a).   Here, by contrast, it seems unlikely that an individual could carelessly or negligently wear a military medal with the intent to deceive.  Thus, there is less danger here that individuals will self-censor their sartorial choices for fear of being prosecuted for negligent speech.[7]

There is also much less ambiguity in the wearing of a military medal, and that diminishes the risk of selective prosecution under this provision.   *Id.* at 2555 Breyer, J., concurring in the judgment) (noting the risk that § 704(b)

---

[7] For reasons the panel explained in *Perelman*, because we must read § 704(a) to prohibit only the wearing of a medal with the intent to deceive, the statute does not apply to anyone wearing a medal in a theatrical production, as part of a Halloween costume, or in protest as a political statement.  695 F.3d at 870 (listing these and other examples).  In these situations, we will readily recognize that the wearer is making no claim to being a medal recipient.  The only person who can be prosecuted under § 704(a) is one who is lying and wants us to rely on his possession of the medal as proof of his valor.  There is no First Amendment value in that lie.

may be applied "subtly but  selectively to speakers that the Government does not like," particularly in the political arena).  Human speech is often ambiguous and subject to different interpretations.  As a result, speech subject to § 704(b) must be understood in context, and thus is more easily subject to manipulation and "the risk of censorious selectivity by prosecutors." *Id.*  As judges, we are familiar with the dangers of reading a cold record and trying to supply voice inflection, facial expression, and body language.**[8]**  For good reason, we defer to the fact-finders who have actually seen the witnesses to judge their demeanor as a measure of their truthfulness.  *See e.g.*, *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."); *United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("'The most careful note must often fail to convey the evidence fully in some of its most important elements. . . . It cannot give the look or manner of the witness: his hesitations, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration.'" (quoting *Queen v. Bertrand*, 16 Eng. Rep. 391, 399 (1867))).

---

**[8]** Consider, for example, Charlie Chaplin's classic exchange in *The Great Dictator* (1940).  When Chaplin mutters "this is a *fine* country to live in," he is arrested, but escapes punishment by explaining that all he said was "this is a fine country to live in."  Joseph G. Brennan, *A Handbook of Logic* 213 (2d ed. 1961) (describing this an example of the informal "fallacy of accent").  *See also Watts v. United States*, 394 U.S. 705, 708 (1969) (overturning the petitioner's conviction for threatening the President because his statement, made at a political rally opposing the Vietnam war, was simply "crude" "political hyperbole," not a true threat).

By contrast, wearing clothing, particularly with the precision demanded when one dons a military uniform, is far less ambiguous than the vagaries of human speech. The very nature of a uniform suggests that once we recognize the distinctive colors and insignia, we know immediately whether we are dealing with the local constabulary or a member of the nation's armed forces, whether the service member is wearing the camouflage of the ground forces or the crisp whites of the navy, whether the service member belongs to the armored division or the medical corps, and whether the member is commissioned or non-commissioned. In the same vein, we can discern, without any words being exchanged, the campaigns in which the member has participated and whether the member has been decorated for actions in combat. Indeed, so clear is our understanding of the meaning of the uniform that no voice inflection or body language can countermand what we have seen for ourselves. Elven Swisher didn't have to tell anyone that his Purple Heart meant that he had been wounded in battle, or that his Navy and Marine Corps Commendation Medal was awarded for valor.

Contrary to the majority's assertion that there is no principled distinction between § 704(a) and § 704(b), Maj. Op. at 29, § 704(a) engenders less potential constitutional harm than § 704(b), because there is less risk to the First Amendment in the government identifying and policing specific instances of deceptive *conduct* than in trying to police the line between false and true *statements*.

B

The false wearing of military medals poses significantly greater harm to the government's interests than does mere false speech. That means that, contrary to the majority's

assertion, Maj. Op. at 31, the government's objectives here are *not* precisely the same as those at issue under § 704(b). The United States has a powerful interest in protecting the integrity of its military decorations. Indeed, Congress has punished the wearing, manufacture, or sale of military decorations without authorization since 1923. *See* Act of Feb. 24, 1923, ch. 110, 42 Stat. 1286. The wearing of an unearned military medal dilutes the message conveyed by the medal itself. Even if the wearer is later exposed as a liar, the utility of the medal as a symbol of government commendation has been undermined. The public can no longer trust that the medal actually *is* a symbol of government commendation, i.e., that the person wearing the medal has actually earned it. This results in a different, more concrete harm than that which may arise from the false *statement* that one has earned a military medal. It is one thing to say that one has been decorated; it is quite another to produce the evidence for it by appropriating a symbol that the government, through decades of effort, has imbued with a particular message. Unlike false statements, which may work harm by giving the public the general impression that more personnel earn military honors than actually do, the false wearing of medals directly undermines the government's ability to mark out specific worthy individuals, because the symbol the government uses to convey this message can no longer be trusted. This may also mean that those who *rightfully* wear a military medal are less likely to be believed.

In this respect, a military medal is akin to a trademark: a symbol that denotes a particular level of quality, or worthiness. *See Alvarez*, 132 S. Ct. at 2554 (Breyer, J., concurring in the judgment) ("Statutes prohibiting trademark infringement present, perhaps, the closest analogy to the present statute."). As Justice Breyer recognized in *Alvarez*,

a false claim regarding a military medal "creates confusion about who is entitled to wear it, thus diluting its value to those who have earned it, to their families, and to their country." *Id.*  Although in *Alvarez*, Justice Breyer ultimately concluded that the confusion caused by false statements was not sufficient to outweigh the constitutional harm caused by the statute, here, the calculus is different, because § 704(a) creates *less* risk of constitutional harm, and because the wearing of an unearned medal offers *more* convincing proof of the lie than a mere false statement.

The false and deceptive wearing of military medals "dilutes the value" of military honors generally, by conveying the impression that "everyone" earns them.  Moreover, such conduct also dilutes the symbolic value of the medal itself, hampering the government's ability to reward those it has concluded are worthy of recognition.  The purpose of a military medal is not only that it conveys the government's appreciation for an individual's service to the individual, but that it conveys the government's commendation of that individual to others, identifying the medal winner "as an example worthy of emulation." *United States v. Alvarez*, 617 F.3d 1198, 1234 (9th Cir. 2010) (Bybee, J., dissenting). The value of the military medal, like the value of a trademark, is that it is both recognizable and publicly understood to convey a specific message: in this case, the message that the wearer has done something worthy of admiration.  When those who are unworthy are allowed to wear the medal, the government can no longer identify its heroes in a way that is easily discernible by the public.

To be clear, this harm does *not* occur when an unearned medal is worn for purposes of art, theater, political expression, or the like.  It is only when the medal-wearer

wears the medal in order to appropriate the message conveyed by the medal—that the wearer has actually earned a military honor—that the medal's symbolic value is diluted. Elven Swisher, however, was not wearing his false military medals for purposes of art, political expression, intellectual debate, or even any of the "innocent" reasons people may lie. He wore his medals to support the elaborate story he had concocted to fraudulently obtain disability benefits from the government. He even wore his fraudulent medals to embellish his credibility when testifying at a criminal trial (not his own). *See United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) (en banc), *as amended*, 611 F.3d 1098 (9th Cir. 2010).[9] It is absurd to argue that allowing someone like Swisher to wear unearned military honors in the course of impersonating a war hero does not do significant damage to the value of the genuine honor bestowed on those who have sacrificed for their country.

---

[9] Swisher testified as a government witness in a federal murder-for-hire case, appearing on the witness stand with a Purple Heart pinned to his lapel. *Hinkson*, 585 F.3d at 1254. Swisher testified that the defendant in that case, David Hinkson, had heard about his impressive military service record and had wanted to hire him to torture and kill a federal judge, an AUSA, and an IRS agent. During the course of the trial, Hinkson's lawyers called Swisher's credibility into serious question, on the basis that his "reissued" military discharge papers, which detailed the military honors Swisher had supposedly won, could not be authenticated. *See id.* at 1251–57 (recapping the Hinkson trial and Swisher's role); *see also United States v. Hinkson*, 611 F.3d 1098 (9th Cir. 2010) (en banc) (amending the original en banc opinion); *id.* at 1099 (W. Fletcher, J., dissenting) (discussing in even more detail Swisher's relationship with Hinkson and the Hinkson trial). The parties here agreed that Swisher's conduct at the Hinkson trial would not be introduced at his own trial. Swisher was indicted based on a photograph showing that he had worn his false medals to a Marine Corps League event.

C

Finally, there are fewer less restrictive regulatory alternatives available to the government where the unauthorized and deceptive wearing of a military medal is concerned. To be sure, the statutory provision at issue here punishes the same kind of lie at issue in *Alvarez*. But the fact that the lie here is told in a more effective way, with physical proof in the form of the medal to support the false claim of entitlement, increases the harm caused by the lie and also means that other, less restrictive means are less likely to be effective. Justice Breyer noted that many statutes punishing false statements require some showing of actual or likely harm resulting from the lie and suggested that "a more finely tailored statue might . . . insist upon a showing that the false statement caused specific harm or at least was material, or focus its coverage on lies most likely to be harmful or on contexts where such lies are most likely to cause harm." *Alvarez*, 132 S. Ct. at 2556 (Breyer, J., concurring in the judgment). Section 704(a) satisfies Justice Breyer's concerns. First, the harm caused by the false wearing of military medals is material. It is material to the message conveyed by the medals themselves. When pretenders wear medals, the medal itself can no longer be taken as a sign that the wearer has earned it and is therefore worthy of commendation. Second, § 704(a) is confined to a single context—the intentional wearing of medals when the wearer intends to deceive—where it is most likely to cause harm.

Moreover, "counterspeech" will be less effective in correcting the falsehood conveyed by deceptively wearing an unearned military decoration. *See Alvarez*, 132 S. Ct. at 2549–50 (Kennedy, J.) (plurality opinion); *id*. at 2556 (Breyer, J., concurring in the judgment). One could denounce

Swisher as an impostor, but as the Fourth Circuit explained, "speech may not effectively counter that which a person sees." *Hamilton*, 699 F.3d at 373. One could, perhaps, engage in a war of words with Alvarez, but Swisher, who has the medals on his uniform, occupies the high ground.

Finally, the majority, following *Alvarez*, 132 S. Ct. at 2550–51 (Kennedy, J.) (plurality opinion); *id.* at 2556 (Breyer, J., concurring in the judgment), proposes a database of medal winners as a means to counteract Swisher's deception.[10] Maj. Op. at 31–32. To my mind, this is no solution at all to the problem of individuals falsely wearing medals. If the public has to check the database to confirm that a medal wearer actually earned the medal, the purpose of the medal itself is utterly defeated. If we can no longer trust what we can see, the only honor the United States can confer on its heroes is a listing in a database. Once wearing the medal itself doesn't signify anything more than a presumption of a property right, the nation's highest honors will have become, literally, virtual.

III

I would uphold the constitutionality of §704(a). I respectfully dissent.

---

**[10]** The majority, quoting *Alvarez*, refers to the database as an "'information-disseminating device'" for confirming that the medal wearer has actually earned the military honor. Maj. Op. at 31–32 (quoting *Alvarez*, 132 S. Ct. at 2556 (Breyer, J., concurring in the judgment)). Although it is low-tech, we already have such an "information-disseminating device": the medal.